Johnie Michael COX *v.* STATE of Arkansas

CR 91-16                                      853 S.W.2d 266

Supreme Court of Arkansas
Opinion delivered May 17, 1993

*John Wesley Hall, Jr.*, by: *Craig Lambert*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. This is an appeal from the capital murder conviction of Johnie Cox, appellant, sentenced to death by lethal injection for the murder of three individuals. Cox raises seven points for appeal, but we find none have merit.

On November 1, 1989, Margaret Brown, William Brown and Marie Sullens were in their apartment in Kensett, Arkansas, when Cox came to see Ms. Sullens. Cox told police he had gone there to kill Ms. Sullens because he believed she was trying to

murder his grandfather. Apparently she was looking after the grandfather and Cox thought she had attempted to kill him by leaving gas on in his apartment.

William and Margaret Brown were at the apartment when Cox arrived. He held a .22 pistol on William and had him bind Marie and Margaret with electrical cords and duct tape. Cox then tied William and bound all three together at the neck. Cox tried unsuccessfully to kill each of them by inflicting stab wounds with a knife and by strangling them with electrical cord. To assure their death he set fire to the house. All three individuals died from a combination of the stab wounds, strangulation and fire.

Cox was arrested on December 5, 1989, and gave a detailed confession of the murders. He was tried on three counts of capital murder, found guilty, and sentenced in a bifurcated proceeding to death by lethal injection on all three counts. Cox filed a motion for a new trial under Ark. R. Crim. P. 36.4 alleging his defense counsel was ineffective, but after a hearing the trial court denied the motion. Cox appeals from the conviction and the denial of his Rule 36.4 motion.

Before addressing appellant's arguments, we will first review the facts in comparison to other cases in which we have affirmed the death penalty. *See Johnson* v. *State*, 308 Ark. 7, 832 S.W.2d 800 (1992). We do so to achieve evenhandedness of the application of the death penalty. *Collins* v. *State*, 280 Ark. 312, 657 S.W.2d 546 (1977); *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1983), and *Johnson* v. *State, supra*. As was stated in *Johnson*:

> The real issue is whether the wickedness, inhumanity, and heinousness of this murder is comparable with that of other murder cases in which we allowed the sentence of death to stand.

The medical examiner testified that Margaret Brown had a total of fourteen stab wounds in the neck, chest, breast and side, and had a electrical cord constricting her neck. He found she had died before the fire from a combination of stab wounds and strangulation. He testified that William Brown had wires around his neck but had not died of strangulation. He had two stab

wounds, one in front and one in his back and was still alive at the time of the fire. He died from a combination of the stab wounds and the fire. Marie Sullens, who was sixty-eight years old, had been stabbed six times in the back and neck, some of the wounds penetrating the chest and lung. She was also alive when the fire started and died as a result of the stab wounds and the fire.

Statements taken from Cox's written confession and a video taped confession contained the following narrative of the murders:

> I held the gun on Billy [William Brown] and made him tie Marie and Margaret. . .He used electric cord to tie them up. I made him tie their hands and feet. Then I tied him up. I had him hold his hands over his head with his back to me. I ran the cord around his neck and had him put his hands down. That caused the cord to tighten around his neck. . . .

> [Billy] said [Margaret] had some type of sleeping pill and it was supposed to have been a nerve pill, . . .so whenever they introduced me to that I said well, all of them need to go to sleep and I had them all take four pills, and whether they took them or not or spit them out I don't know. . . .

> Marie wanted to [go to the bathroom] so I cut the cords tying her to the others and carried her to the bathroom. I brought her back in and laid her on the bed and . . . then that's when I tried to kill her, at least I thought I was trying to kill her. . . . I stabbed her several times. [Prior to that I had been in the kitchen] drinking Coke and eating chips. . . . I was waiting on the pills to take effect so that I could set a fire and smoke would kill them. . . . I got tired of waiting more or less because I had been there long enough. [So that's when I started to kill Margaret.] I yanked up a coat because she started making noises and stuff like that, and so I muffled it the best I could until I could get in position. I tried stabbing her and couldn't kill her, so I just took a shot at her and couldn't kill her, so I just took an electrical cord and wrapped it around her neck and held it with one of my feet and took my hands and pulled it up until I choked her to death, but she was even breathing

after that.

> Then I stabbed Billy in the chest and turned him over on [his wife Margaret] and stabbed him in the back. I figured he was dead, but he was alive. . . . I went to Marie and tried to cut her throat with that knife but it was too dull. . . . Well, [Marie] didn't say nothing else, and the wire was around her neck, and like I say, I was impatient, and I was in a hurry. . . and then I went back into the kitchen and I drank some more Coke and ate some more chips, and then I got out of there after I set the fire.

In sum, the proof is overwhelming the three murders committed by Cox were brutal, inhumane and heinous, two of them perpetrated merely because the victims happened to be there. The crimes are fully comparable to those in other cases in which we allowed the sentence of death to stand. *See Starr* v. *State*, 297 Ark. 26, 759 S.W.2d 535 (1988); *Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988); *Simmons* v. *State*, 278 Ark. 305, 645 S.W.2d 680 (1983), and *Hayes* v. *State*, 278 Ark. 211, 645 S.W.2d 662 (1983).

As grounds for reversal, appellant first argues a continuance should have been granted because his trial closely coincided with two Arkansas executions which generated considerable publicity. Neither execution had any connection to the appellant or to the case. Appellant has cited no authority for this point. Nor has he shown that he was in any way prejudiced; he merely argues in conclusory terms that "the publicity and attendant public mood is prejudicial" and that "likely created a prejudicial climate." We said in *Cash* v. *State*, 301 Ark. 370, 784 S.W.2d 166 (1990) on a question of change of venue due to pretrial publicity:

> The appellant did not have a right to a jury totally ignorant of the crime. *Bussard* v. *State*, 300 Ark. 174, 778 S.W.2d 43 (1989). Our review of the *voir dire* of the jurors in this case shows that while some had heard of the case or read about it, none of those selected said they could not give the appellant a fair trial. *Burnett* v. *State*, 299 Ark. 553, 776 S.W.2d 327 (1989). What the appellant was entitled to and what he got in our judgment was a jury composed of persons who could and did decide the case on the testimony presented in court and not on the basis of news media

coverage of the matter. *Logan* v. *State*, 299 Ark. 266, 733 S.W.2d 413 (1989).

■ The denial of a motion for a continuance is within the sound discretion of the trial court and a ruling denying such motion will only be reversed if there is an abuse of that discretion, *Stone* v. *State*, 290 Ark. 204, 718 S.W.2d 102 (1986), and the burden of demonstrating that abuse is upon the appellant. *Wade* v. *State*, 290 Ark. 16, 716 S.W.2d 194 (1986). To warrant reversal the appellant must additionally show that any abuse of discretion was prejudicial. *Mann* v. *State*, 291 Ark. 4, 722 S.W.2d 117 (1988).

■ As in *Cash* v. *State, supra*, we have reviewed the voir dire of the jurors and find only minimal notice by panel members of the two unrelated executions, in spite of repeated inquiries by counsel. None of the jurors selected said they could not give a fair trial and it can be fairly said the jury was composed of persons who could decide the case on the testimony presented and not on the basis of media coverage of two unrelated cases. Given that review of voir dire we find no merit in appellant's argument.

■ Appellant next argues the trial court erred in failing to hold our capital murder statute unconstitutional because it does not narrow the class of death eligibility. This argument was addressed and rejected in *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992).

Third, appellant argues the sentencing provisions of our death penalty statute violate the Constitution because they deprive the jury of showing mercy to the defendant and the trial court erred in refusing to give instructions which so informed the jury. Appellant maintains Ark. Code Ann. § 5-4-603(a) (1987) violates the Constitution as applied to this case, unless the trial court instructs the jury that it has the power to reject the death penalty. That statute provides:

The jury shall impose a sentence of death if it unanimously returns written findings that:

(a) Aggravating circumstances exist beyond a reasonable doubt; and

(b) Aggravating circumstances outweigh beyond a

reasonable doubt all mitigating circumstances found to exist; and

(c) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

Appellant argues in his brief:

This court has indicated that a jury should be told that despite its findings that aggravating circumstances exist and outweigh those in mitigation, it can still exercise mercy in answering the third question as to whether the aggravating circumstances justify a sentence of death. . . . *However, thus far this court has declined to invalidate the statute for its failure to so state or to order trial courts to give juries instructions to that effect.*

In other words, appellant acknowledges that we have consistently held this scheme is not a mandatory death statute and therefore unconstitutional for failure to allow the jury to show mercy to a particular defendant. *See, e.g., Hill* v. *State,* 289 Ark. 387, 713 S.W.2d 233 (1986); *Johnson* v. *State, supra.* His challenge then is to the lack of further instructions by either the court or in the statute itself to more thoroughly inform the jury that it has the option of rejecting the death penalty and imposing instead life without parole.

■ This argument is in essence identical to one we have repeatedly rejected, i.e. that § 5-4-603(a) imposes a mandatory death penalty. In so doing, we have held the statute and instruction (AMCI 1509) are framed so as to lead the jury adequately through the process. We stated in *Ruiz* v. *State,* 299 Ark. 144, 772 S.W.2d 297 (1989):

The wording of the instructions of [1509] is such, we believe, that a jury readily understands that it has the option of a lesser penalty. The instructions tell the jury that "in no event" will it return a verdict of death unless it unanimously makes three written findings which include a finding that "the aggravating circumstances justify beyond a reasonable doubt the sentence of death." *Thus a jury is told that it may reject the death penalty simply by declining to make that essential finding.* This same argument, in varying shades, has been rejected repeatedly in

prior cases. [Cases omitted].

This statement in *Ruiz* was in response to a defense request that the wording in the instructions be changed so the instruction would not require a mandatory death penalty.

Furthermore, if there were any doubts in the minds of the jurors on this point they could not have remained after the defense counsel's closing argument in the penalty phase. He took the jury carefully through the steps they would make in their voting process, making it clear at each juncture what was required of them to find the death penalty or life without parole. There could have been no uncertainty in the minds of the jurors of the procedures to be followed and of the consequences.

In his fourth point, appellant submits the trial court erred in admitting a video tape and photos of the crime scene. Appellant contends the photographs of the victims were sufficiently gruesome so as to come under our holding in *Barry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986). We have examined the photographs and tape and find no merit to this point. We also note that the prosecutor had almost two hundred photos from the crime scene and eliminated those that were cumulative or unnecessary to the presentation of his case. At a subsequent hearing the number introduced was considerably less, and on appeal appellant objects to only twenty-two.

Next, appellant contends the trial court erred in voir dire rulings with respect to jurors Thacker, Davis and Hodges. Appellant urges two of the jurors, Davis and Hodges, should have been excused for cause, and that Thacker should not have been excused for cause.

The matter of the trial court's decisions on venire persons will not be overturned absent an abuse of discretion. *Allen* v. *State*, 281 Ark. 3, 660 S.W.2d 922 (1983). Here, a review of Davis and Hodges' voir dire makes it clear there was no abuse. Any uncertainties that might have arisen from the responses of either Hodges or Davis were cured by rehabilitative questions. *See Scherrer* v. *State*, 294 Ark. 227, 742 S.W.2d 877 (1988). Any remaining doubts were of the type only the trial court could resolve and in that we defer to its superior position.

As to juror Thacker there was an adequate basis for the

trial court's excusal for cause. Mrs. Thacker's son had been prosecuted for a felony by the same prosecutor and the county's sheriff department had been conducting an investigation into her husband's business, a flea market, for suspected possession of stolen property. There was no abuse of discretion in the trial court's excusing this juror for cause.

Finally, appellant argues the trial court erred in submitting the aggravating circumstance for the jury's consideration. Appellant was charged with the capital murder of three individuals under three separate counts of capital murder, pursuant to Ark. Code Ann. § 1-10-101(a)(4) (1987):

> (a) A person commits capital murder if:
>
> ****
>
> (4) With the premeditated and deliberated purpose of causing the death of one person, he causes the death of any person.

At the guilt phase of his trial, he was convicted of all three counts of capital murder under this statute. At the sentencing phase of the trial, evidence was submitted to support the aggravating circumstance of Ark. Code Ann. § 5-4-604(4) (1987):

> Aggravating circumstances shall be limited to the following:
>
> ****
>
> (4) The person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim.

The state's theory on this aggravating circumstance is that in each murder, appellant had created a great risk of death to the other two victims. The murder of each victim then, constituted an aggravating circumstance for each other victim, so that each murder also served as the basis for the aggravating circumstance of another murder.

Appellant makes two points challenging the constitutionality of this procedure: it amounted to "double counting," and it failed to genuinely narrow the class of death-eligibles.

Both double counting and the narrowing function of death penalty schemes were addressed in *Lowenfeld* v. *Phelps*, 48 U.S. 231 (1988). The essence of *Lowenfeld* is that double counting is not significant in itself but rather the question is whether the statutory scheme genuinely narrows the class of death eligibles. In *Lowenfeld*, an element of capital murder was duplicated in the only aggravating circumstance presented, but the court found Louisiana's capital murder statute sufficiently narrowed the death-eligibles in the offense itself from non-capital murders, and there was no constitutional requirement for further narrowing. The opinion notes that aggravating circumstances are not ends in themselves. *Lowenfeld* holds such narrowing can withstand constitutional scrutiny regardless of whether the narrowing occurs at the guilt phase or the sentencing phase.

Therefore under *Lowenfeld* double counting in itself is no longer significant, the question is whether the scheme provides for a genuine narrowing of death-eligibles at either the guilt or the sentencing phase. Consequently, double counting is not impermissible under the Eighth Amendment.

Neither is there a problem here with the statutory scheme providing a genuine narrowing of death eligible persons. As we held in *Johnson* v. *State, supra*, relying on *Lowenfeld*, the narrowing function can occur at either the guilt phase or the sentencing phase. And specifically as regards § 5-10-101(a)(4) we stated:

> [Under *Lowenfeld*] the legislature may itself narrow the definition of the crime so that the finding of guilt in a death penalty case is necessarily a narrow finding, or the legislature may more broadly define capital offenses and provide for the required narrowing by jury findings of aggravating circumstances at the penalty phase. The legislature previously narrowed the class in both ways but, under the 1989 amendment ["Piazza" amendment which provided that premeditated murder of *one* person was a capital offense, where previously it required two] has broadened the definition of the crime so that the narrowing now primarily occurs at the penalty phase.

So in the case before us, appellant was charged under § 5-10-101(a)(4) (1987), which is a broad definition of the

capital offense—premeditated and deliberate death of any person. But while that class of offenses is somewhat broad, it becomes genuinely narrowed by the aggravating circumstance in this case, that the murder occurred creating a great risk of death to other persons.

In the face of that appellant then offers this argument: When a defendant kills more than one person the scheme "automatically converts any case involving the killing of more than one victim into a death case." While we would agree that the killing of more than one person "automatically" converted this into a death case, that is not because of any infirmity in the statutory scheme. As discussed above, our scheme provides the genuine narrowing required under *Lowenfeld, supra*. Rather, it is because appellant committed the capital offenses under a circumstance that the legislature had enumerated as an aggravating factor. Under appellant's argument the same might be said for all the other aggravating circumstances listed in § 5-4-604, i.e. any time a defendant commits murder under the aggravating circumstances, he will be "automatically" death qualified. However, this is precisely the purpose of aggravating circumstances.

Appellant also suggests that *Lowenfeld, supra*, is distinguishable from our case because the narrowing occurred at the guilt phase in *Lowenfeld* and at the sentencing phase in this case. While this is true, we held in *Johnson* v. *State, supra*, that the narrowing may occur at either phase, and specifically held it permissible at the sentencing stage. Furthermore, as argued by the dissent in *Lowenfeld*, having the narrowing occur at the sentencing phase is fairer to the defendant.

Appellant also suggests that by the language of the aggravating circumstance itself it was never intended to cover actual murders, but only as it states, "risks" of death. Similar provisions in other jurisdictions have found similar aggravating circumstance to cover actual deaths though only "risk" is mentioned in the statute as in ours. *See Stafford* v. *State*, 665 P.2d 1205 (Cr. App. Okla. 1983) (defendant herded six victims into a meat freezer and opened fire at close range and killing all six); *State* v. *Sonnier*, 379 So.2d 1336 (La. 1979), 402 So.2d 650 (La. 1981), cert. den. 103 S. Ct. (1983) (the execution of two victims lying side-by-side with six rapid rifle shots).

■ Further, as the state points out, under appellant's argument a person who creates risks of death to other people would be eligible for the death penalty, but one who actually kills others is not. We do not interpret even a criminal statute so strictly as to reach absurd consequences that are clearly contrary to the legislative intent. *State* v. *Joshua*, 307 Ark. 79, 818 S.W.2d 249 (1991)

As to appellant's motion under Ark. R. Crim P. 36.4, three points are made under his argument that a new trial was warranted because he was denied effective assistance of counsel. We find the arguments without merit.

■ In order to show his attorney was ineffective an appellant must first show that counsel's performance was so deficient that the counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second he must show that he was so prejudiced by the defense as to be deprived of a fair trial. The appellant must show there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. Conversely, this court indulges in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland* v. *Washington*, 466 U.S. 688 (1984); *O'Rourke* v. *State*, 298 Ark. 144, 765 S.W.2d 916 (1989).

■ Cox first claims his counsel failed to move for a change of venue or to adequately support his motion for a continuance. As pointed out in our response to appellant's first argument, which is essentially the same point, our review of voir dire persuaded us that regardless of whether this could be considered error, no prejudice occurred.

■ Second, Cox argues defense counsel failed to fully present as a mitigating circumstance that at least one of the murders, perhaps all three, was committed by someone other than Cox. Cox primarily relies on a number of small inconsistencies in his written and videotaped confessions. Without detailing the specifics we find it sufficient to state that these inconsistencies were minor and insignificant in the face of overwhelming admissions in Cox's statements.

As his last point, Cox argues his counsel provoked juror Davis during voir dire, which created hostility toward Cox. Cox claims in conclusory fashion that prejudice should "be presumed since his fate was in the hands of an obviously hostile juror." The record reveals no hostility in Davis' answers to questions posed by the court or by counsel and Davis stated he would hear all the evidence before making up his mind with regard to guilt. Ultimately this is an issue that must be left to the trial court's discretion, as a subjective judgment must be made as to the truthfulness of Davis' answer. Therefore, finding no evidence to support appellant's claim, we affirm on this point.

The record has been examined in accordance with Ark. Sup. Ct. R. 11(f), and it has been determined that there were no rulings adverse to the appellant which constituted prejudicial error.

Affirmed.