Everick MONK *v.* STATE of Arkansas

CR 94-1416                                    895 S.W.2d 904

Supreme Court of Arkansas
Opinion delivered April 3, 1995

*William R. Simpson, Jr.,* Public Defender, by: *C. Joseph Cordi, Jr.,* Deputy Public Defender, for appellant.

*Winston Bryant,* Att'y Gen., by: *Clint Miller,* Acting Deputy Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Everick Monk was convicted of rape, burglary, and robbery. He was sentenced to forty years imprisonment. He contends the evidence was insufficient to support the conviction and that evidence of pretrial identifications of him by the victim should have been suppressed. He also contends it was error to admit into evidence an envelope and its contents, bearing his name and fingerprints, which the victim allegedly found in her apartment after the commission of the crimes. We hold the identification testimony and the physical evidence were admissible and the evidence was sufficient to sustain the conviction.

In the middle of the afternoon on November 26, 1993, the 74-year-old victim heard a knock on the front door of her apartment in the Albert Pike Hotel in Little Rock. When she opened the door, a man forced his way into her apartment and repeatedly hit her with "his open hand." She attempted to get away from him, and he continued to hit her until they reached her bedroom. Once they were in the bedroom, the intruder stuck his finger in her vagina and forced her to engage in fellatio. After the attack, he demanded money and took $20.

After the intruder had left her apartment, the victim noticed an envelope that did not belong there. She testified it was a white,

long, oblong envelope with some writing on the outside. She said that she laid it on the table and did not alter its contents in any way. Although she was too afraid and upset to call anyone other than her daughter on the evening following the incident, she did call 911 the next morning. When the police arrived, she gave Officer Mark Little the envelope.

Approximately four days passed between the report of the incident and a visit by the victim to the police station to view a photo lineup. During that period Detective Oberle developed Everick Monk as a suspect from the name "Monk Everick" on the food stamp notice contained in the envelope. During the delay that resulted from his attempts to obtain a photograph of Mr. Monk, Detective Oberle spoke with the victim's daughter about the investigation. He testified the daughter called him every day and he was reasonably sure she knew the delay was caused by his efforts to obtain the photograph.

Once he obtained the photograph, Detective Oberle asked the victim to come to the police station to view a lineup of photographs. In the presence of her daughter and the detective, the victim picked out two "look-alikes." One of them was Everick Monk. Although Detective Oberle did not say anything to the victim concerning the identity of anyone in the photographs, he said he might have told the victim's daughter, after the victim had picked it as a "look alike," that the number 2 photograph depicted Everick Monk, the suspect.

Mr. Monk was arrested on December 10, 1993. On December 23, 1993, Detective Oberle called the victim back to the police station to view a physical lineup. Mr. Monk was the only person from the photospread who also appeared in the physical lineup. In addition, the detective testified that the victim knew Mr. Monk had been arrested and would be in the lineup. Detective Oberle testified that after a very brief time of viewing the men in the lineup, the victim positively identified Mr. Monk as her attacker. After she made her identification, the detective told the victim that "she got the right one, or picked the right guy that we had arrested."

Prior to trial Mr. Monk moved to suppress both identifications. During a hearing in April 1993 the victim made a positive in-court identification of Mr. Monk as the perpetrator; however,

at a hearing held in August 1993 on a second motion to suppress the victim testified she was not sure the man in the courtroom on the day of the first hearing was her attacker. She said that on the way home after the first hearing she had asked her daughter if the man in the courtroom was the same man that she had picked from the lineups.

Ultimately, the victim admitted on cross-examination during the trial that she was not sure the man in the courtroom during the hearing in April was the same man who was in her apartment on that afternoon in November. She also testified she "could not be sure or correct in pointing out any individual who may have been in my house."

At the trial, the victim did not identify Mr. Monk as the person who had attacked her. Detective Oberle testified concerning her pre-trial identifications of Mr. Monk from the photospread and the physical lineup. In addition, the State sought to introduce the envelope and contents the victim allegedly found on her bedroom floor after the attack. Although Mr. Monk objected to the admission of the envelope on the basis of authenticity, the Trial Court allowed it to be introduced.

Mr. Monk moved for a directed verdict at the close of the State's case-in-chief, contending the State failed to prove that he was the perpetrator. The motion was denied. At the close of all the evidence, the motion was renewed by counsel who said, "Your Honor, I renew all my previous objections, including specifically the Motion for Directed Verdict based on the same argument that I made at the close of the State's case."

### 1. Sufficiency of the evidence

To preserve the question of the sufficiency of the evidence, a motion for directed verdict must be made at the close of the State's evidence and at the close of the case. Ark. R. Crim. P. 36.21(b). The motion must be specific and apprise the Trial Court of the ground asserted for granting the motion. *Penn* v. *State*, 319 Ark. 739, 894 S.W.2d 597 (1995); *Jones* v. *State*, 318 Ark. 704, 889 S.W.2d 706 (1994). A general motion will not do. *Davis* v. *State*, 319 Ark. 460, 892 S.W.2d 472 (1995).

Mr. Monk's initial motion for directed verdict was to the effect that there had been no testimony identifying him as the cul-

prit. In response, the Trial Court pointed out Detective Oberlé's testimony concerning the pretrial identifications by the victim. Mr. Monk's counsel then renewed his motion to suppress that testimony as well as his objection to the admissibility of the envelope and contents.

■ While we have some doubts about the sufficiency of the renewal of the directed verdict motion at the close of the case, we need not decide the case on the basis of the content of that motion. The sufficiency of the evidence question became, through counsel's discussion with the Trial Court, no more than renewal of his earlier evidentiary objections. We thus can dispose of the case by resolving the issues presented in those objections.

### 2. Extra-judicial identification

Mr. Monk argues that both the photo lineup and the physical lineup procedures were unnecessarily, and unconstitutionally, suggestive. Prior to discussing those procedures, however, we note that Mr. Monk has cited *Synoground v. State*, 260 Ark. 756, 543 S.W.2d 935 (1976), for the proposition that identity cannot ordinarily be established by evidence of an extrajudicial identification as original evidence. The decision in the *Synoground* case was based on *Trimble v. State*, 227 Ark. 867, 302 S.W.2d 83 (1957), in which we held that evidence of extrajudicial identification could not be used to buttress unimpeached testimony of a witness making an in-court identification.

■ We have strong doubts whether those cases apply here in view of the fact that the victim made no in-court identification subsequent to the omnibus hearing, and her identification at the omnibus hearing was certainly impeached. In any event, the objection raised at the trial was not on the basis of the rationale expressed in the *Synoground* and *Trimble* cases, so we need not consider it here. *Penn v. State, supra; Campbell v. State*, 319 Ark. 332, 891 S.W.2d 55 (1995).

■ From the constitutional perspective, the admissibility of testimony concerning pretrial identification is determined on standards similar to those applied to identification testimony offered in court. *See Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381 (1972). A pretrial identification violates the Due Process

Clause when there are suggestive elements in the identification procedure that make it all but inevitable that the victim will identify one person as the criminal. *Bishop* v. *State*, 310 Ark. 479, 839 S.W.2d 6 (1992). Even if the identification technique used was impermissibly suggestive, however, testimony concerning it is admissible if the identification was reliable. *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977); *Bishop* v. *State, supra.*

The factors to be considered in the determination of reliability are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the prior description; (4) the level of certainty; and (5) the time lapse between the crime and the confrontation. We do not reverse a ruling on the admissibility of an identification unless it is clearly erroneous, and we do not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of irreparable misidentification. *Bishop* v. *State, supra.*

### a. The photospread

With respect to the photospread, it is argued that, due to the communication between Detective Oberle and the victim's daughter, the victim knew prior to viewing the photographs that one of the pictures would be of a man suspected of the crimes. Mr. Monk contends that increased the odds of his picture being selected from the lineup. In other words, he argues the victim's knowledge foreclosed the possibility that she would not find anyone in the lineup she could identify as her assailant.

In *Hayes* v. *State*, 311 Ark. 645, 846 S.W.2d 182 (1993), we held it not absolutely impermissible to tell a witness a suspect was in a lineup, for the witness must realize that she would not be called to view the lineup if a suspect were not present. Rather, what the witness has been told is only one factor to be considered.

Considering the totality of the circumstances, it is doubtful that any knowledge the victim may have had about a suspect being in the lineup caused her to identify Mr. Monk as a look-alike mistakenly. The photospread provided in the abstract of the record of trial reveals that all of the men in the lineup were

African-American and each had facial hair similar to the description the victim gave to the police.

█ Detective Oberle testified he did not say anything to the victim which would have led to the identification. Mr. Monk argues the photo lineup here was more suggestive than the one we approved in *Hayes* v. *State, supra,* because Detective Oberle privately indicated to the victim's daughter that Mr. Monk was the suspect. As noted above, however, that conversation appears to have taken place after the victim had identified the look-alikes. There was nothing unconstitutionally suggestive about the photo lineup, and thus the testimony concerning it was admissible.

### b. The physical lineup

Mr. Monk contends the physical lineup was unduly suggestive because the victim, again through her daughter, had access to information concerning the identity of the perpetrator. In addition, he contends the procedure was suggestive because he was the only person from the photospread who also appeared in the physical lineup.

While it is possible the daughter could have told the victim that the victim had picked the suspect in the photospread, the only "evidence" Mr. Monk was able to present on the point was the victim's rather swift positive identification at the physical lineup. It is doubtful that the physical lineup was rendered impermissibly suggestive by the fact that Mr. Monk was the only man from the photospread to reappear in the second identification procedure. Detective Oberle testified that the men who appeared in the photospread were merely "fillers," and that the use of their pictures did not necessarily indicate they were all in custody. Thus, he said that when the time came for the victim to view the physical lineup, he had to use fillers who were already in custody.

Clearly, the appearance of different men in the second procedure was unavoidable. We observe from a picture of the physical lineup that the fillers all had similar physical characteristics to those of Everick Monk.

No case has been cited in which we have dealt squarely with the question whether a less than positive, or look-alike, identification taints a subsequent identification as the result of the viewer's familiarity upon seeing in the flesh a person whose picture

she has previously been shown. In *State* v. *Neslo*, 433 So.2d 73 (La. 1983), a case similar to this one, the Louisiana Supreme Court considered the problem. Two victim-witnesses selected Neslo and another person in a photo lineup as persons who "resembled" the man who shot and shot at them and killed their friend. Later the victim-witnesses were shown a physical lineup including Neslo, and again two persons, one of them Neslo, were selected but not positively identified. Still later, the same lineup was reassembled, and the victim-witnesses identified Neslo as someone who looked like their assailant.

■ In holding that the identification of Mr. Neslo was not unduly suggestive, the Louisiana Supreme Court said the procedure used was proper and indeed followed that suggested in *Manson* v. *Brathwaite, supra.* Emphasis was placed on the fact that in neither the photo lineup nor the physical one was there anything which made Mr. Neslo stand out. There was further discussion about the opportunity of the witnesses to view the suspect at the time the crime was committed, and both victim-witnesses said they were not influenced by the prior photo lineup in their reactions to the physical lineup. While no such testimony was given in Mr. Monk's trial, that is not very significant. The point is that the Louisiana Supreme Court was unwilling, as are we, to say that a progressive identification procedure which proceeds from photographs to physical is, *per se*, unduly suggestive.

■ Of course, the jury had before it evidence that Mr. Monk's picture had been seen by the victim prior to the physical lineup in which he appeared. It also had before it evidence that the victim had in effect withdrawn the positive identifications she had made at the physical lineup and at the omnibus hearing thus reverting to a stance of uncertainty. In these circumstances the jury was placed in a position to evaluate the weakness or strength of the identification testimony, and we cannot say the Trial Court abused his discretion in admitting the evidence.

### 3. The envelope and contents

The problem here is that the victim did not identify the envelope and contents at the trial as the one she found in her bedroom after the crimes were committed. We must determine if this physical evidence was properly authenticated and thus admissible.

In evidentiary determinations, a trial court has wide discretion. *Utley* v. *State*, 308 Ark. 622, 826 S.W.2d 268 (1992). We will not reverse a trial court's ruling concerning the admissibility of evidence unless there is an abuse of discretion. Rule 901(a) of the Arkansas Rules of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Subsection (b) of the Rule provides, in part, as follows:

> (b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

> (1) Testimony of a witness with knowledge. Testimony of a witness with knowledge that a matter is what it is claimed to be.

\* \* \*

The victim testified that after the intruder left her apartment, she found the strange envelope on her bedroom floor where a significant portion of the attack occurred. She described it as a long white envelope with some writing on the outside. She stated she placed it on a table and then gave it to the police when they arrived at her apartment the following morning. She testified on cross-examination that there was only one intruder involved in the incident, which would foreclose the possibility of the envelope belonging to another suspect. Her testimony shows that the letter was not in her apartment before the attack and that she found it in her apartment immediately afterward.

Officer Little testified that when he arrived at the apartment the victim presented him with a white, long envelope that had writing on the outside. He said the envelope was in his possession from the time he received it from the victim until he stored it in the property room at the police station. At the trial, he identified the envelope and testified that the serial numbers placed on it for identity purposes at the property room matched. Officer Little testified that, to his knowledge, no one had tampered with the envelope or its contents other than those officers who tested it for fingerprints. A fingerprinting specialist with the Little Rock Police

Department testified that the fingerprints from the envelope matched those on Everick Monk's print card.

Given the testimony of those witnesses, we cannot say the Trial Court abused his discretion in concluding the identity of the envelope and its contents was sufficiently established as that found by the victim in her apartment. That evidence contributed materially to overall strength and sufficiency of the evidence identifying Mr. Monk as the assailant.

Affirmed.