Terrick Terrell NOONER *v.* STATE of Arkansas

CR 94-358                                      907 S.W.2d 677

Supreme Court of Arkansas
Opinion delivered October 9, 1995
[Petition for rehearing denied November 13, 1995.]

88

*Herbert T. Wright, Jr.,* for appellant.

*Winston Bryant,* Att'y Gen., by: *David R. Raupp,* Asst. Att'y Gen., with *Savannah Dyer,* Law Student practicing pursuant to Rule XV(E)(1)(b), for appellee.

ROBERT L. BROWN, Justice. The appellant, Terrick Terrell Nooner, was convicted of capital murder committed in furtherance of a robbery and sentenced to death by lethal injection. He raises 15 points on appeal. We agree with the State that the points have no merit, and we affirm.

On March 16, 1993, at approximately 1:30 a.m., Scot Stobaugh entered the FunWash laundromat on West Markham Street in Little Rock to do laundry. While there, he was shot seven times and died of multiple gunshot wounds. He was found lying face down on the laundromat floor in a pool of blood. Subsequent examination showed that he was shot twice in the upper right arm and five times in the back in what later were described as contact wounds. Seven .22 caliber shell casings were found on the floor close to the body together with a tan hat, keys, and a jar of Carmex lip salve. His Chevrolet Beretta was parked in the laundromat's parking area unlocked, with its parking lights on, and with keys in the ignition. A ring and a neck band remained on the victim's body.

The FunWash laundromat had three surveillance cameras in operation at the time of the shooting which recorded on one VHS videotape. The general manager of the business, Janie White, helped investigating police officers from the Little Rock Police Department retrieve the videotape. The videotape depicted Stobaugh and a second person accosting him in the laundromat. It did not show the actual murder.

Detective Joe Oberle, a homicide detective with the Little Rock Police Department, took possession of the videotape and had still photographs made from the frames that included the victim and the suspect. Detective Oberle used several private

firms in Little Rock to enhance the tape in order to obtain the clearest still picture possible — Color Masters, Camera Mart, and Jones Productions. In four of the enhanced photographs, the victim's face was "mosaicked out" at the request of his family and one of those photographs was given to the news media to assist in the investigation. Rick Adcock with the Little Rock Police Department Crime Scene Search Unit also made still photographs from the videotape.

Ron Andrejack, the firearms examiner for the State Crime Laboratory, examined the bullets and shell casings found at the crime scene and determined that five of the seven bullets were fired by the same firearm. The other two bullets were too damaged for any conclusion to be reached. He further determined that all seven shell casings were fired from the same gun. By examining the various marks on the bullets and shell casings, he ultimately concluded that the characteristics on the bullets and shell casings were consistent with a .22 long rifle Ruger semiautomatic pistol.

In a matter of days, the police investigation centered on Nooner due in large part to statements given to Detective Oberle by Antonia "Toni" Kennedy, a friend of Nooner's. Antonia Kennedy is the sister of Jazmar Kennedy, who identified Nooner in the surveillance photographs at trial, and the sister of Terri Kennedy, who was Nooner's girlfriend at the time of the trial and who testified as a defense witness. Antonia Kennedy implicated Nooner in the FunWash shooting and subsequently testified at trial that on the morning after the shooting Nooner told her that he had murdered Scot Stobaugh after demanding money from him. She added that she had seen Nooner with a .22 Ruger pistol that day and had kept the gun for Nooner for a brief period of time. Nooner was arrested on April 23, 1993, and charged with capital murder, aggravated robbery, and theft of property.

On September 20, 1993, a seven-day trial commenced. Nooner was convicted of capital felony murder with aggravated robbery and theft of property as the underlying felonies. After the penalty phase of the trial, the jury found two aggravating circumstances: (1) that Nooner had previously committed another felony, an element of which was the use or threat of violence; and

(2) that the murder was committed for pecuniary gain. The jury found no mitigating circumstances and returned a verdict of death by lethal injection.

## I. JUROR DISMISSED FOR CAUSE

Nooner first contends that the trial court erred in removing a juror for cause based on her attitude toward the death penalty. Citing *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), Nooner urges that this juror was struck due to her conscientious scruples against the death penalty rather than her total opposition to it, which violated his right to due process.

During the *voir dire* examination, juror Elizabeth Miller was questioned by counsel and by the circuit court. Her responses to the State's questions on *voir dire* were as follows:

> PROSECUTOR: Is the fact that the death penalty is sitting out here if you find him guilty going to cause you to make me have to do more than that? Have to prove beyond all shadow of a doubt or all imaginary doubt that he's guilty?
>
> JUROR: Yes.
>
> PROSECUTOR: It is?
>
> JUROR: Uh huh (Meaning yes).
>
> PROSECUTOR: So, in other words, you would hold us to that higher standard?
>
> JUROR: Yes.
>
> PROSECUTOR: In a case like this there are two possible sentences. If you, the jury, would render a guilty verdict, there are only two sentences. One is life imprisonment without parole. That's one option, and the other is the death penalty. Do you feel that if you have those two choices before you, that you would be inclined to lean toward life imprisonment?
>
> JUROR: Yes.
>
> PROSECUTOR: If you had those choices before you, would you automatically feel that the life imprison-

ment without parole would be your choice?

JUROR: Yes, I do.

PROSECUTOR: So, in other words, regardless of the evidence that we presented to you that might suggest that the death penalty is appropriate, it's your belief that you would — If you were a juror, you would vote for life imprisonment without parole?

JUROR: Yes, uh-huh (Meaning yes).

Ms. Miller's responses to the defense counsel's questions were as follows:

DEFENSE COUNSEL: If you determine that they're guilty, then you consider punishment. The Court will instruct you that in order to consider the death penalty, the State has to prove certain aggravating circumstances and prove that those aggravating circumstances outweigh any mitigating circumstances that may exist beyond a reasonable doubt.

JUROR: I understand.

DEFENSE COUNSEL: If the Judge instructed you that that was the law, and those were the instructions you were supposed to follow, could you follow those instructions?

JUROR: I think so.

. . . .

DEFENSE COUNSEL: And you can follow his instructions and consider everything that you should consider in making your determination which punishment is possible or which punishment is appropriate?

JUROR: Yes.

. . . .

DEFENSE COUNSEL: If the Judge instructs you that the State has the burden of proving each and every element the charges against Terrick beyond a reason-

able doubt, and he further instructs you that a reasonable doubt isn't any possible or imaginary doubt. It's a doubt that would cause a reasonable person to pause or hesitate in one of the grave transactions of life. And, further, that a juror is convinced beyond a reasonable doubt when they have an abiding conviction of the truth of the matter. Could you follow that instruction?

JUROR: I think so.

On requestioning by the State, the juror answered:

PROSECUTOR: You really don't want to have to ever be the person who would have to vote on whether or not you could sentence somebody to death. Is that correct?

JUROR: That's right.

PROSECUTOR: Would it be really difficult for you? Do you think you could actually sign your name to a verdict form?

JUROR: No, I don't think so.

Upon questioning by the circuit court, the juror stated:

CIRCUIT COURT: Can you conceive of any circumstances where you had a choice between life without parole and the death penalty where you would choose the death penalty?

JUROR: I don't know.

The circuit court then issued its ruling:

After viewing this juror, she said several things that were a bit inconsistent. Taking an overall view of all of her questions, I'm convinced that if this lady is part of this jury, that the State would be foreclosed from a verdict before we start. I believe this lady is irrevocably locked into voting for life without parole, and because of that would not follow the evidence, and so, I'm going to grant the State's motion for cause as to this juror.

██ The decision to excuse a juror for cause rests within the sound discretion of the trial court and will not be reversed

absent an abuse of discretion. *Biggers* v. *State*, 317 Ark. 414, 878 S.W.2d 717 (1994); *Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993). We have said that the standard for determining if a prospective juror should be excused for cause is no longer whether that person makes it unmistakably clear that he or she would automatically vote against the death penalty. *Pickens* v. *State*, 301 Ark. 244, 250, 783 S.W.2d 341, *cert. denied* 497 U.S. 1010, *cert. denied* 500 U.S. 929 (1990). The standard now is whether a juror's views about the death penalty would prevent, or substantially impair, the performance of the juror's duties in accordance with the instructions and the oath taken. *Pickens* v. *State*, *supra*. Hence, the circuit court must decide if the juror's views would prevent or substantially impair performance of his or her duty as a juror, and we give great deference to the circuit court that sees and hears the potential jurors. *Wainright* v. *State*, 307 Ark. 569, 823 S.W.2d 449 (1992).

■ Here, it is true that juror Miller testified that she would follow the court's instructions. However, she also stated that she would have to be "totally convinced" of the defendant's guilt before she could consider the death penalty and that regardless of the State's evidence she would vote for life imprisonment. She further responded that she could not actually sign her name to a verdict form in which the death penalty was imposed. A reasonable conclusion from these answers is that her views on the death penalty would in fact have either impaired or prevented the performance of her duties as a juror. We bestow great deference on the circuit court in such matters, and we find no basis for a decision that the court abused its discretion.

## II. EVIDENCE OF ROBBERY

For his next point, Nooner contends that there was insufficient evidence of robbery as the predicate felony for capital murder. He argues that the victim's car was not taken and that the body was found with personal jewelry still intact.[1]

■ The evidence of the robbery in this case is circum-

---

[1]The record indicates that the personal jewelry evidence was elicited during the penalty phase of the trial and not during the guilt phase. Its relevance is limited, therefore, to whether the murder was perpetrated for pecuniary gain — an aggravating circumstance.

stantial, but circumstantial evidence may constitute substantial evidence when every other reasonable hypothesis consistent with innocence is excluded. *Trimble* v. *State*, 316 Ark. 161, 871 S.W.2d 562 (1994); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993); *Bennett* v. *State*, 308 Ark. 393, 825 S.W.2d 560 (1992). Whether a reasonable hypothesis exists is for the trier of fact to resolve. *Trimble* v. *State, supra; Sheridan* v. *State, supra; Bennett* v. *State, supra.* In assessing whether evidence is substantial, we view the facts in the light most favorable to the appellee. *Gatlin* v. *State*, 320 Ark. 120, 895 S.W.2d 526 (1995); *Trimble* v. *State, supra.*

We disagree that the proof of robbery was insufficient. Items on the floor beside the body, including the keys and Carmex, are some proof that the victim's pockets had been rifled. More importantly, Toni Kennedy testified that on the morning after the shooting she had seen a checkbook with the name Scot Stobaugh in Nooner's possession. Added to this proof was the fact that Nooner told Toni Kennedy that he demanded money from the victim at FunWash. Finally, the videotape in the laundromat which was reviewed by the jury shows the victim raising his hands, as the suspect walked behind him. The victim was later found shot to death. The State's proof meets the test of substantial evidence.

### III. DISCOVERY DEFICIENCIES

Nooner next contends that he was denied due process of law because the prosecuting attorney was impermissibly dilatory in providing the names and addresses of state witnesses, the opinion of the expert witness regarding the type of gun involved, autopsy photographs, and a diagram of the laundromat by a crime scene specialist.

Rule 17.1(a)(i) of the Arkansas Rules of Criminal Procedure requires the prosecution to give the names and addresses of witnesses it intends to call at trial, and Rule 19.2 imposes a continuing duty to disclose this information. *Lewis* v. *State*, 286 Ark. 372, 691 S.W.2d 864 (1985). The trial court has four options under Rule 19.7 to remedy a violation of the rules: permit discovery, exclude the undisclosed evidence, grant a continuance, or enter an order as the court deems appropriate under the circumstances. *Id.* In some instances, a recess to interview the witness is sufficient. *Lewis* v. *State, supra; Dupree* v. *State*, 271

Ark. 50, 607 S.W.2d 356 (1980); *Hughes* v. *State*, 264 Ark. 723, 574 S.W.2d 888 (1978).

On Friday, September 17, 1993, before the trial began on Monday, September 20, 1993, the prosecutor provided this information to the defense attorneys:

- Johnny Martin would testify as to the identity of Nooner in the videotape and photographs.

- Two employees who worked at the Markham Liquor Store next to FunWash would testify that Russell Patton, who had been involved in a March 5, 1994 burglary at FunWash, was not the man in the videotape or photographs.

- Ron Andrejack would testify that the weapon used was consistent with a .22 Ruger semi-automatic pistol.

- Still photos taken from the videotape of the March 5, 1994 FunWash burglary would be introduced.

A diagram of the crime scene by crime scene specialist, Lisa Sakevicious, was not provided to the defense in advance of trial; nor were autopsy photographs.

The circuit court offered opportunities for interviews of witnesses whose names were provided on the Friday before trial commenced and allowed the same opportunity for reports and documentary evidence. The defense interviewed Johnny Martin during the trial before its cross-examination. The court also noted the fact that the defense had had Martin's name from the prosecutor's file for several months. With regard to the Markham Liquor Store employees, the circuit court observed that an objection to their testimony was not made until the Thursday after trial commenced —some six days after the defense was apprised of their identity and that they would testify. The circuit court ruled that was sufficient prior notice.

Though Ron Andrejack's additional conclusion about the .22 Ruger semi-automatic gun was not provided until the Friday before trial, the circuit court stated that the defense had known Andrejack would be a witness for some time and had not interviewed him. In addition, the prosecutor had turned over Andre-

jack's opinion as soon as the prosecutor received it. The court also stated that the autopsy photographs were reasonably anticipated as part of the State Medical Examiner's testimony, which the defense knew would be forthcoming at trial, and that the crime scene diagram was an instructional aid to the jury.

■■ This court is well aware of the fact that the last minute exchange of evidence before trial is sometimes inevitable as trial preparation is brought to a head and comes to a close. The issue, however, is whether last minute preparation was abused in this matter and used as a ploy or subterfuge to gain advantage over the opposing party. *See Banks* v. *Jackson*, 312 Ark. 232, 848 S.W.2d 408 (1993). Stated another way, was there an attempt to conceal discoverable evidence from the defense? We have endowed the trial courts with great discretion over such matters, and the circuit court in this case assessed each assertion of a Rule 17.1(a)(i) violation carefully before making its decisions. The circuit court was reasonable in its resolution of these matters, and we cannot say that it abused its discretion. Moreover, this court does not recognize the doctrine of cumulative error when there is no error to accumulate. *Dillon* v. *State*, 317 Ark. 384, 877 S.W.2d 915 (1994).

### IV. IDENTIFICATION TESTIMONY

Two State witnesses — Johnny Martin and Jazmar Kennedy — testified that it was Nooner in the videotape and photographs. Martin testified that he saw Nooner several hours before the murder and that he was wearing a green jacket and a black-and-orange Miami baseball hat. Jazmar Kennedy testified that she recognized Nooner in the videotape and photographs wearing her sister Terri Kennedy's green jacket along with his Miami baseball hat. She also knew it was Nooner by his physical appearance, how he stood, and his mouth.

Nooner contended at trial and now on appeal that this testimony invaded the province of the jury, was not helpful to the jury, and was a matter ultimately for the jury to decide. He further urges that this testimony violates the silent witness theory that the videotape speaks for itself. Both this court and the Arkansas Court of Appeals have considered appeals where an identification of the defendant or accomplice was made by a witness from photographs, but neither court has resolved the precise

issues raised by Nooner in this appeal. *See Young* v. *State*, 308 Ark. 643, 826 S.W.2d 281 (1992); *Hicks* v. *State*, 271 Ark. 132, 607 S.W.2d 388 (1988)(bench trial); *Washington* v. *State*, 31 Ark. App. 62, 787 S.W.2d 254 (1990).

■ This issue turns to a large extent on Rule 701 of the Arkansas Rules of Evidence which limits lay witness opinion testimony to testimony which is rationally based on the perception of the witness and helpful to the determination of a fact issue and an understanding of the testimony. Such opinion testimony is not objectionable merely because it *embraces* an ultimate issue to be decided by the trier of fact. Ark. R. Evid. 704. Whether to admit relevant evidence rests in the sound discretion of the trial court, and the standard of review is abuse of discretion. *See Russell* v. *State*, 306 Ark. 436, 815 S.W.2d 929 (1991); *Monk* v. *State*, 320 Ark. 189, 895 S.W.2d 904 (1995); *Utley* v. *State*, 308 Ark. 622, 826 S.W.2d 268 (1992).

In this case, the jury had before it the videotape and photographs taken the night of the murder, mug shots of Nooner taken within weeks after the murder, and the presence of Nooner in the courtroom at trial some six months after the murder. At trial, Nooner's appearance differed from that in the mug shots. He wore glasses, his hair was longer, and he had a moustache.

■ Nooner argues that neither Martin nor Jazmar Kennedy had adequate knowledge of him so as to be able to make an identification in the videotape and photographs and, thus, satisfy the conditions of Rule 701. We disagree. Jazmar Kennedy had known Nooner for about three years and had seen him regularly. She had even lived in the same apartment with him for a period of time. Martin testified that he had seen Nooner on five or six occasions and had seen him just a few hours before the murder. Both witnesses recognized the jacket and cap in the videotape and photographs and associated the clothing with Nooner. These were special facts otherwise unknown to the jury. The two witnesses then positively identified Nooner as the man with Scot Stobaugh. We hold that these witnesses had ample contact with Nooner to develop opinions based on their perceptions and that the trial court did not abuse its discretion in permitting them to relay their opinions to the jury. *See People* v. *Mixon*, 180 Cal. R. 772, 129 Cal. App. 3d 118 (1982).

■    We next turn to the argument of whether this testimony was helpful to the jury. We believe that it was. The videotape and surveillance photographs are not crystal clear for identification purposes but are somewhat blurred and indistinct. Hence, any testimony from people who had a special familiarity with the suspect would qualify as an aid to the jury. *See People* v. *Mixon, supra; Hardie* v. *Florida*, 513 So.2d 791 (Fla. App. 1987).

■    In sum, we conclude that the clothing testimony and identification by Martin and Jazmar Kennedy were properly formed opinions based on a reasonable association with Nooner. This conclusion is abetted by the fact that Nooner's appearance had changed at trial, with the glasses, longer hair, and moustache. As legitimate opinion testimony, the identification by the two witnesses did not violate Rule 704. Finally, we do not view this holding as running contrary to the silent witness theory, as Nooner urges. *See Fisher* v. *State*, 7 Ark. App. 1, 643 S.W.2d 571 (1982) (discussion of the theory). An identification of a person in a surveillance videotape, based upon the viewer's special familiarity with the person and ample opportunity to observe him, does not vitiate this theory which permits the introduction of surveillance videotape based on context and without a sponsoring witness.

## V. ENHANCED PHOTOGRAPHS

Nooner contends that it was error for the circuit court to allow into evidence photographs that had been "manipulated." He further maintains that because the photographs were "altered," the silent witness theory should not apply. The State counters that the photographs were not "altered" but were merely "enhanced" by giving more brightness and improving the contrast for better definition, as one does when adjusting a television picture.

We first emphasize that there is nothing before us that indicates that the still photographs of the suspect ultimately introduced into evidence were changed to include a face, features, or physique of someone not present in the original videotape. Indeed, the jury and the circuit court watched a slowed version of the original videotape and then saw the "enhanced" still photographs. Thus, the viewers of the tape had the opportunity to identify any distortion in the photographs of the depicted suspect.

In a pre-trial hearing regarding whether the photographs should be suppressed, state witnesses, including representatives of private firms, meticulously described their role in the enhancement process. Rupert Robertson, a video specialist for Arkansas Power & Light Company, testified that he slowed the original videotape down by making an exact duplicate of it in the Betacam format and then freezing each frame for several seconds. Tom Burney of Jones Productions testified that he took a still frame from the duplicate videotape, transferred it to his computer, and softened the pixels on the suspect's face to remove the graininess. He did not add or subtract features from the original, except to "mosaic out" the victim. Carl Tillery of Color Masters testified that he took the computer disk prepared by Tom Burney and made still photographs. He multiplied the pixels per square inch to improve the contrast and adjusted the brightness in one of the still photographs. He also testified that he in no way altered the features in the photographs. Jeff Bishop from Camera Mart testified that he made still photographs from the original videotape. He only adjusted the brightness in the photographs.

▮▮▮ Reliability must be the watchword in determining the admissibility of enhanced videotape and photographs, whether by computer or otherwise. We turn to the treatise cited by the Arkansas Court of Appeals in *Fisher* v. *State, supra:*

> Relevant computer-enhanced still prints made from videotape recordings are admissible in evidence when they are verified as reliable representations of images recorded on master videotapes. . . . The master videotape used in producing the computer enhancement should also be admitted in evidence to help determine the reliability of the still picture.

3 C. Scott, Photographic Evidence § 1295 (2d ed. 1969 & Supp. 1994). In the case before us, the original videotape was introduced into evidence and viewed by the circuit court and jury, and the reliability of the enhanced photographs was attested to by multiple witnesses. There was no evidence of distortion to any photograph of the suspect. The circuit court properly ruled in a pre-trial hearing that so long as the process leading to the duplicate videotape and enhanced photographs was explained to the

jury, it would allow their introduction. This was done during trial. There was no abuse of discretion under the facts of this case.

## VI. MISCELLANEOUS ISSUES

Nooner advances myriad additional points for reversal, none of which has merit.

### 1. Arbitrary and Discriminatory

He urges that the death penalty was applied arbitrarily and capriciously and in a racially discriminatory fashion in his case. He cites us to a law review article in support of this contention and alludes to the fact that Nooner is black and the victim was white. *See* "Patterns of Deaths: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization," 37 Stan. L. Rev. 27 (1984). The United States Supreme Court, however, has held that a discriminatory purpose must be proved on the part of the decision-maker in the defendant's particular case. *McClesky* v. *Kemp*, 481 U.S. 279 (1987). Here, Nooner's allegations were broad brushed, and no proof was offered to show how Nooner's due process or equal protection rights were violated by a biased or arbitrary judge or jury. The motion was appropriately denied due to lack of proof.

### 2. Burden of Proof

Nooner contends that the burden of proof must be higher in death cases than the standard of beyond a reasonable doubt in order to meet the requirements of the U.S. Constitution and specifically the requirements of the Sixth, Eighth, and Fourteenth Amendments. State law, however, fixes the burden of proof for all criminal offenses as proof beyond a reasonable doubt. *See* Ark. Code Ann. § 5-1-111 (Repl. 1993). Nooner adduces no caselaw or other authority in contravention of this statute. The circuit court properly denied Nooner's motion in this regard.

### 3. Overlapping

Nooner raises the spectre of unconstitutional overlapping between our capital murder statute and first degree murder statute in that the two statues blur and proscribe the same conduct. According to his theory, the statutes do not give proper notice of the criminal offenses and are void for vagueness. This court has discounted this argument on numerous occasions. *See,*

*e.g., Greene* v. *State*, 317 Ark. 350, 878 S.W.2d 384 (1994); *Sanders* v. *State*, 317 Ark. 328, 878 S.W.2d 391 (1994); *Buchanan* v. *State*, 315 Ark. 227, 866 S.W.2d 395 (1993); *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992); *Van Pelt* v. *State*, 306 Ark. 624, 816 S.W.2d 607 (1991); *Smith* v. *State*, 306 Ark. 483, 815 S.W.2d 922 (1991).

Nooner also contends that aggravated robbery is not enumerated as a predicate felony for capital murder in the governing statute, only robbery is. *See* Ark. Code Ann. § 5-10-101 (Repl. 1993). We adopt again the reasoning in *McClendon* v. *State*, 295 Ark. 303, 306, 748 S.W.2d 641, 642-643 (1988):

> In support of this the appellant asserts that the underlying felony, aggravated robbery, is not one of the seven felonies that can support a charge of capital felony murder. This argument has been raised before. In *Simpson* v. *State*, 274 Ark. 188, 623 S.W.2d 200 (1981), we held the General Assembly could not conceivably have intended that robbery, which may involve no force, would support a charge of capital murder, while aggravated robbery, an inherently dangerous crime, would not. Aggravated robbery is still robbery.

Though § 5-10-101(a)(1) has been amended since the *McClendon* case, the quoted rationale continues to be convincing. The circuit court correctly denied this motion.

### 4. Mandatory Review

Nooner argues under two of his 15 points that Arkansas statutes dealing with capital murder (Ark. Code Ann. § 5-4-601, *et seq.* (Repl. 1993)) must be deemed unconstitutional for failure to provide for mandatory appeals of all death cases. Nooner has no standing to make this argument because he has exercised his right to appeal. *See Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992) *cert. denied*, 112 S.Ct. 3043 (1992). What another defendant sentenced to death *might* do relative to appeal is immaterial. *Id.* The circuit court did not err in denying this motion.

### 5. Mandatory Death Sentence

Nooner maintains that our sentencing statutes demand

a death sentence and eliminate consideration of mercy by the jury. *See* Ark. Code Ann. § 5-4-603 (Repl. 1993). We have previously held that this is not the case. *See Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993); *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993); *Johnson* v. *State, supra.* We have underscored that our statute provides that a jury is free to sentence to life without parole if it finds the aggravating circumstances do not "justify" death. *See* Ark. Code Ann. § 5-4-603(b)(3) (Repl. 1993). There was no error on this point.

### 6. Narrowing of Death Crimes

Nooner argues that the definition of capital murder does not sufficiently narrow the crime for which the death penalty can be imposed. He specifically alludes to overlap between definitions of capital murder and first degree murder, which we have already discussed. The United States Supreme Court has held that the required narrowing of crimes susceptible to the death penalty may occur at the penalty phase of the trial. *Lowenfield* v. *Phelps*, 484 U.S. 231 (1988). This court has previously held that our statutes pass the narrowing requirement by limiting the death penalty to crimes involving sufficient aggravating circumstances. *See Sheridan* v. *State, supra.* There is no merit to Nooner's contention.

### 7. Victim's Checking Account

Nooner argues that the circuit court erred in failing to exclude evidence of the victim's checking account. He makes a Rule 403 argument in this regard that the relevance of the checking account and checks was outweighed by its prejudice to him. *See* Ark. R. Evid. 403. This is a matter of trial court discretion. *Lindsey* v. *State*, 319 Ark. 132, 890 S.W.2d 584 (1994); *Simpson* v. *Hurt*, 294 Ark. 41, 740 S.W.2d 618 (1987). Aggravated robbery was the underlying felony for the State's charge of capital murder. It was essential that robbery be proved by the State. Antonia Kennedy testified to seeing the victim's checkbook with his name on the checks in the possession of Nooner. She described the color of the checks as beige or tan. Her credibility was challenged by the defense as to the existence of the checking account and the color of the checkbook. A bank employee laid the foundation for a check which had the victim's name and signature.

Kennedy then testified that these checks looked like those she saw in the car with Nooner. As the evidence of the checks was part and parcel of the State's evidence establishing robbery, we find no abuse of discretion in the court's receiving this evidence.

### 8. Aggravating Circumstances

Nooner contends that evidence of a prior robbery conviction should not have been received as an aggravating circumstance because it resulted from a guilty plea under the First Offenders Act and the sentence imposed under that Act was inappropriate. The legitimacy of the conviction or sentence, however, is not what the statute requires; rather, it provides that an aggravating circumstance is one where a person has previously *committed* a second felony involving the use or threat of violence to another. Ark. Code Ann. § 5-4-604(3) (Repl. 1993). We note that Nooner does not contest the fact that he entered a guilty plea to robbery. We hold that the proof of a prior felony involving violence was sufficient.

Nooner further contends that there was no proof that the murder was perpetrated for pecuniary gain, another aggravating circumstance. *See* Ark. Code Ann. § 5-4-604(6) (Repl. 1993). He references a ring left on the victim's finger, a necklace around his neck, and the Beretta in the parking lot as evidence of no theft or robbery. Other proof contravenes this assertion. There was proof that Stobaugh's checkbook was taken, items from his pocket were on the laundromat floor, his hands were raised in the videotape, and Antonia Kennedy testified that Nooner told her that he demanded money from the victim. The evidence of pecuniary gain was clearly sufficient.

### 9. Victim Impact Testimony

For his final point, Nooner urges that the admissibility of victim impact testimony — specifically, the testimony of the victim's mother, Paula Stobaugh — was irrelevant and prejudicial. He further maintains that the statute providing for victim impact testimony is vague. *See* Act 1089 of 1993, now codified at Ark. Code Ann. § 5-4-602(4) (Repl. 1993). We disagree.

The United States Supreme Court permits the States to authorize victim impact testimony. *Payne* v. *Tennessee*, 501 U.S. 808 (1991). The Court referred specifically to who might

qualify as being impacted by a victim's death and to the State's legitimate interest in counteracting the defendant's mitigating evidence and in reminding the jury that the victim was a person "whose death represents a unique loss to society and in particular to his family." 501 U.S. at 825. Thus, the testimony may range from the victim's family to those close to that person who were profoundly impacted by his death. In the case before us, only Mrs. Stobaugh gave impact testimony. We decline to hold Act 1089 of 1993 to be impermissibly vague.

We further decline to limit the applicability of Act 1089 to crimes committed after its effective date on April 13, 1993. What evidence is offered during the penalty phase of the trial and after a finding of guilt is more a matter of procedure. Legislative Acts respecting procedure may be applied to crimes which occurred prior to the Act's effective date. *Williams* v. *State*, 318 Ark. 846, 887 S.W.2d 530 (1994). The Court in *Payne* v. *Tennessee, supra*, referred to victim impact evidence in the penalty phase as a procedural matter for the states to consider and remedy, if they saw fit:

> The States remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs. Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.

501 U.S. 824-825. It is true that Act 1089 does permit other matters relevant to punishment, including, but not limited to, victim impact evidence. But by expanding the scope of permissible evidence during the penalty phase, the General Assembly has not expanded the scope of punishment or added a new aggravating circumstance. We hold that permitting this testimony under Act 1089 did not constitute an *ex post facto* law. *See Mitchell* v. *Oklahoma*, 884 P.2d 1186 (Okla. Crim. App. 1994).

## VII. RULE 4-3(h)

The record has been reviewed pursuant to Supreme Court Rule 4-3(h) for reversible error, and none has been found. We do feel constrained to discuss an objection made by the defense which related to a statement made by the prosecuting attorney in

closing argument during the penalty phase. This colloquy occurred before the jury:

> What is this case about? It's about a person who committed a robbery in 1987, and who you heard from his own father, from Mr. Nooner (sic), that 10 days after he got out of confinement, he committed another robbery, another theft and another murder.

> MRS. O'KELLEY: Your Honor, I'm going to object. There's not been any evidence that he ever committed a murder.

> THE COURT: That will be sustained.

The jury retired to consider its verdict, and the defense moved for a mistrial on grounds that there was no evidence that Nooner had committed any other murder. The circuit court termed the comment a "slip of the tongue" and denied the mistrial motion. Defense counsel requested an instruction that arguments of counsel are not evidence. The court stated that it had already given that instruction but agreed to send another instruction into the jury room reiterating that arguments of counsel are not evidence. This was done.

■ While we have some question about the timeliness of the mistrial motion, we find no reversible error in what transpired in any case. The defense counsel's objection was immediately sustained, and the jury was appropriately instructed a second time that counsel's arguments were just that, argument, and not proof.

## VIII. CONCLUSION

■ The jury found unanimously that two aggravating circumstances existed and no mitigating circumstances were involved. As already stated, we discern no error in these findings. We have recently reiterated that a weighing of aggravating and mitigating circumstances provides a check on arbitrariness. *Porter* v. *State*, 321 Ark. 555, 905 S.W.2d 835 (1995); *Williams* v. *State*, 321 Ark. 344, 902 S.W.2d 767 (1995).

Affirmed.