Cite as 2023 Ark. 190

# SUPREME COURT OF ARKANSAS
No. CR-22-619

| | |
|---|---|
| COREY MCCULLON<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** December 14, 2023<br><br>APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT<br>[NO. 16JCR-19-1533]<br><br>HONORABLE RANDY F. PHILHOURS, JUDGE<br><br>AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On March 11, 2022, a Craighead County Circuit Court jury convicted appellant, Corey McCullon, of first-degree murder, aggravated residential burglary, terroristic act, and first-degree terroristic threatening, for which he was sentenced as a habitual offender to concurrent sentences of thirty-five years' imprisonment, ten years' imprisonment, five years' imprisonment, and one year's imprisonment, respectively. This sentence was imposed to run consecutively to two sentence enhancements—a fifteen-year sentence for the use of a firearm in the commission of a felony and a ten-year sentence for the commission of first-degree murder in the presence of a child—for an aggregate term of sixty years' imprisonment.

On appeal, McCullon presents nine points: (1) there was insufficient evidence to support his convictions, and the lower court erred when it (2) admitted historical cell site location information analysis; (3) admitted MC1's pretrial identification and permitted her to identify McCullon in court; (4) admitted MC2's pretrial identification and permitted him to identify McCullon in court; (5) overruled McCullon's objection to the racial composition of the jury

panel; (6) excluded evidence that the victim's neighbor saw three men in the victim's driveway on the night of the homicide; (7) denied McCullon's requests for jury instructions on lesser-included offenses; (8) denied McCullon's motion to exclude an in-court identification of McCullon by Devon Wilson; and (9) denied McCullon's motion to dismiss the firearm enhancement.

On September 28, 2023, we accepted certification of this case from the Arkansas Court of Appeals on the basis that it involves an issue of first impression and a substantial question of law concerning the validity, construction, or interpretation of an act of the General Assembly. *See* Ark. Sup. Ct. R. 1-2(b)(1), (6). We affirm.

I. *Facts and Procedural History*

This appeal stems from a home invasion in Jonesboro that resulted in the shooting death of Keisha Criglar on or about November 20, 2019. On December 20, 2019, McCullon was charged with first-degree murder, aggravated residential burglary, terroristic act, and first-degree terroristic threatening.[1] The State later amended the criminal information to charge McCullon as a habitual offender and impose two additional sentence enhancements—one for the use of a firearm in the commission of a felony, and one for the commission of first-degree murder in the presence of a child. *See* Ark. Code Ann. §§ 5-4-501 (Supp. 2019); 5-4-702 (Supp. 2019); and 16-90-120 (Supp. 2019). On March 8–11, 2022, McCullon's jury trial was held. The record before us establishes the following facts.

According to the evidence presented at trial, at around 6:00 a.m. on November 20, 2019, Criglar's minor children went to a neighbor's home and told her that their mother had

---

[1]McCullon was also charged with possession of a firearm by persons having been previously convicted of a felony, but the State ultimately nolle prossed this charge.

2

been shot. The neighbor immediately called law enforcement, and officers with the Jonesboro Police Department ("JPD") arrived at the scene, located at 603 Meadowbrook, shortly thereafter to find that the front door appeared to have been forced open. During a search of the home, law enforcement discovered Criglar's body, and it was noted that Criglar had sustained multiple injuries to her arms, legs, and chest that appeared to be gunshot wounds. Law enforcement also observed ten .40-caliber shell casings in various areas of the home, along with bullet holes in the walls and floor. Detective Rodney Smith with the JPD testified that a bullet had been fired into the floor of the children's bedroom. Dr. Adam Craig, an associate medical examiner at the Arkansas State Crime Laboratory, testified that Criglar had been shot ten times.

Detective Josh Wiiest with the JPD testified that he reviewed audio and video footage captured by the surveillance cameras of a nearby pawn shop, and beginning at approximately 12:18 a.m. on November 20, he heard what he believed to be the gunshots that were fired at Criglar's home.

Devon Wilson and Essence Singleton, both friends of Criglar's, testified that they had been to a house party with Criglar on the evening of November 19. According to their testimony, Singleton dropped both Criglar and Wilson off after the party. Wilson testified that Criglar invited him over to her house soon after to listen to music and have a few drinks, and that he arrived around 11:00 p.m. Wilson further testified that, about an hour later, before leaving Criglar's home, he went to the restroom and heard someone kick in the front door followed by a loud argument soon after. Specifically, Wilson testified that he heard someone say, "where my money at" to which Criglar responded, "I told you I ain't got your money." As he was running out of the house, Wilson saw a short, "dark-skinned" man with gold teeth standing in front of Criglar holding a gun.

3

Criglar's minor children, MC1 and MC2, were interviewed by police about the events surrounding their mother's murder.[2] On November 20, the children were shown photo lineups, and both MC1 and MC2 positively identified McCullon as the man who had broken into their home the night before. At trial, MC1 testified that a few days before her mother was murdered, she remembered a man coming to her house saying that he had lost some money, to which her mother responded that she did not have any money. MC1 and MC2 both testified that they were awoken by a commotion and heard gunshots on the night of the home invasion. MC1 testified that a man entered the room saying, "[G]ive me some money," before he fired a shot into the bedroom floor and searched the children's closet. MC2 testified that the man asked "[MC1], where's the money at," and said that he was going to kill them. MC1 testified that she and her brothers later got up to lock the front door and saw their mother lying on the couch unresponsive. The children returned to their room until the next morning when they told their neighbor what had occurred. At trial, MC1 and MC2 identified McCullon once again as the man they saw in their bedroom the night of Criglar's murder.

Janice Williams, Criglar's mother, testified that she witnessed an argument between Criglar and McCullon on November 17, after she and Criglar arrived at Criglar's home to find McCullon parked in the driveway. Williams testified that during this argument, McCullon accused Criglar and MC1 of stealing money from him, and Criglar repeatedly denied having done so. Williams testified that McCullon said, "[W]ell, I'm going to get my money." Lacretia Sheppard, a friend of Criglar's, provided law enforcement with McCullon's cell phone number because she believed McCullon—whom she referred to by his nickname "Shawt," or

---

[2]Criglar had a third minor child that witnessed these events, but he was unavailable to testify at trial.

"Short"—was involved in the murder. Sheppard testified that on November 18, Criglar told her that she saw McCullon sitting outside down the street, and Criglar believed he was looking at her home.

A "ping" warrant was obtained for McCullon's cell phone number in an attempt to locate him, and a search warrant was also obtained to access the records of that cell phone. Using cell phone location information, police were able to create a map of McCullon's movements and determine that his cell phone had stopped moving in Caruthersville, Missouri. At trial, the State called Special Agent Blake Downing with the FBI's Cellular Analysis Survey Team ("CAST") to discuss historical cell site location information ("CSLI") analysis and his conclusions regarding McCullon's cell phone records. Agent Downing testified that after reviewing McCullon's cell phone records, he was able to determine the following: that, between 11:06 p.m. and 11:18 p.m. on November 19, McCullon's cell phone was traveling closer to Criglar's home on 603 Meadowbrook. Agent Downing's historical CSLI analysis report demonstrated that from 11:28 p.m. on November 19 to approximately 12:24 a.m. on November 20, McCullon's cell phone was located in the general area around 603 Meadowbrook, and by 12:33 a.m., it was away from the address. The report further demonstrated that McCullon's cell phone traveled away from the area of the crime scene heading south on I-555 and arrived in the Trumann area at 1:27 a.m., and the travel ultimately stopped in the Caruthersville area at approximately 2:39 a.m.

On November 20, just before 7:00 p.m., officers with the JPD contacted the Caruthersville Police Department ("CPD") to provide them with information about the case, including a description of McCullon's vehicle—a gold Chevrolet Malibu—and an address where McCullon might be found. Assistant Chief Terry Privett with the CPD testified that,

shortly after receiving this call, McCullon's vehicle was located at Lanisha Sargent's apartment and McCullon was subsequently arrested for Criglar's murder. Officer Dustin Fitzwater with the CPD testified that during a search of Sargent's apartment, a manufacturer's firearm box for a Springfield XDM .40-caliber Smith & Wesson handgun and thirty-seven live rounds of ammunition were seized. The CPD turned this evidence, along with the clothes that McCullon was wearing at the time of his arrest, over to the JPD. Rachel Ganley, a criminalist at the Arkansas State Crime Laboratory, testified that McCullon's jacket tested positive for gunshot residue.

Prior to jury selection, McCullon objected to the composition of the venire. Specifically, McCullon contended that there were sixty-four potential jurors in the jury pool, and only four of those potential jurors were African American. McCullon contended that the venire should have included at least ten African American potential jurors, because his research showed that this demographic made up approximately 16 percent of Craighead County. The Craighead County Circuit Clerk testified about the process for drawing venires and the circuit court overruled McCullon's objection, reasoning that there was no way to know a potential juror's race on the basis of the jury questionnaires.

McCullon moved for a directed verdict at the close of the State's case and at the close of all the evidence, but the circuit court denied both motions with respect to each charged offense. McCullon also orally moved to dismiss the firearm enhancement, arguing that the underlying statute had been implicitly overruled and that it presented issues of double jeopardy. McCullon conceded that Arkansas case law from both this court and our court of appeals had decided both issues adversely to his argument, but he asserted that the cases had been wrongly decided. The circuit court denied this motion. Before the case was submitted to the jury,

McCullon requested jury instructions on lesser-included offenses, including second-degree murder, residential burglary, and second-degree terroristic threatening, but the circuit court denied McCullon's request.

Prior to trial, on February 23, 2022, the circuit court held an initial hearing on several pretrial motions. In defense of his motion in limine regarding "tunnel vision," McCullon asked the circuit court to grant him permission to present evidence at trial to demonstrate that law enforcement failed to pursue other suspects. The circuit court allowed McCullon to elicit testimony regarding two other potential suspects but ruled that he could not reference an investigator's notes that allegedly contained information from an unidentified neighbor that three men were hanging out in Criglar's driveway around the time of the murder, because it would be "hearsay upon hearsay." Regarding his motion in limine to exclude evidence of cell phone location, McCullon argued that the use of historical CSLI analysis to allege the location of McCullon's cell phone did not satisfy the requirements for the admission of scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it relied upon speculation, lacked the proper foundation, and was more prejudicial than probative. Agent Downing testified at length during the hearing regarding the methodology and reliability of historical CSLI analysis, and the circuit court concluded that this evidence was admissible because the *Daubert* test had been satisfied, the State could lay a foundation, and its probative value outweighed any prejudicial effect.

On March 7, 2022, the circuit court heard arguments on McCullon's motion to suppress the identifications made by MC1 and MC2 and to prevent them both from making an in-court identification at trial. McCullon asserted that the first photo lineup presented to MC1, along with the only photo lineup presented to MC2, was unduly suggestive and tainted any future

identifications. After hearing testimony from Detective Keri Varner and Detective Chad Hogard with the JPD regarding the two photo lineups shown to MC1 and the photo lineup administered to MC2, the circuit court held that (1) MC1's first pretrial photo identification was admissible, but the second was inadmissible; (2) MC2's pretrial photo identification was admissible; and (3) the children would be permitted to make an in-court identification at trial. The circuit court also heard arguments regarding McCullon's nearly identical motion to suppress regarding the pretrial identifications by Devon Wilson. After hearing testimony regarding the three photo lineups shown to Wilson from Detective Shane Fox and Detective Hogard, and from Wilson himself, the circuit court ruled that the State was prohibited from introducing any of Wilson's pretrial photo identifications but that it would not prohibit Wilson from making an in-court identification.

On March 11, 2022, McCullon was convicted and sentenced as described above. This timely appeal followed.

## II. *Points on Appeal*

### A. Sufficiency of the Evidence

For his first point on appeal, McCullon contends that there was insufficient evidence to support his convictions.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id*. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d

8

518, 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Drennan v. State*, 2018 Ark. 328, 6, 559 S.W.3d 262, 266. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id*. Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

1.   *Terroristic act*

With these standards in mind, we first turn to McCullon's conviction under Arkansas Code Annotated section 5-13-310(a)(2) (Repl. 2013). A person commits a terroristic act if, "while not in the commission of a lawful act, the person . . . [s]hoots at an occupiable structure with the purpose to cause injury to a person or damage to property." Ark. Code Ann. § 5-13-310(a)(2). Further, "[a] person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Finally, "[c]ausation may be found when the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless: (1) [t]he concurrent cause was clearly sufficient to produce the result; and (2) [t]he conduct of the defendant was clearly insufficient to produce the result." Ark. Code Ann. § 5-2-205 (Repl. 2013).

McCullon asserts that the State's evidence at trial demonstrated that a man forced entry into the victim's residence and fired shots into the wall and floor while inside, and his sole argument regarding this offense is that the plain language of section 5-13-310(a)(2) does not

9

criminalize this conduct. Rather, as he did below, McCullon presents an issue of first impression and contends that the legislative history underlying the statute makes clear that the legislature intended the statute to criminalize shooting a firearm into an occupiable structure from its exterior. The State responds that the plain language of section 5-13-310(a)(2) unambiguously criminalizes shooting at an occupiable structure, whether from within or from outside of the structure. We agree with the State.

We review issues involving statutory construction de novo, as it is for this court to decide the meaning of a statute. *State v. Britt*, 368 Ark. 273, 275–76, 244 S.W.3d 665, 667 (2006). When reviewing issues of statutory interpretation, the first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id*. When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Id*. A statute is ambiguous only when it is open to two or more constructions, or when it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning. *Id*. When a statute is clear, however, it is given its plain meaning, and this court will not search for legislative intent; that intent must be gathered from the plain meaning of the language used. *Id*.

Here, the plain language of section 5-13-310(a)(2) unambiguously criminalizes shooting at an occupiable structure, making no qualifications with respect to the perpetrator's vantage point. Despite McCullon's assertion that shooting "at" an occupiable structure means "into" the structure from the outside, this interpretation finds no support in the clear language of the statute. Therefore, our analysis need not go further, and we decline McCullon's invitation to engage in statutory interpretation by taking into consideration the intent of the legislature.

Having found that section 5-13-310(a)(2) criminalizes shooting at an occupiable structure, regardless of one's positioning with respect to the structure, we now turn to the evidence that supports McCullon's terroristic act conviction. The State produced evidence at trial sufficient for the jury to conclude that McCullon fired a handgun after unlawfully entering Criglar's home with the purpose of causing injury to Criglar, and in the process, several bullets were fired into the floor and walls of the residence. Additionally, the eyewitness testimony of MC1, and her subsequent identifications of McCullon, established that McCullon purposely fired a gunshot into the floor of the children's bedroom.

Therefore, when considering this evidence in the light most favorable to the State, we conclude that there was substantial evidence to support McCullon's terroristic act conviction.

### 2. *Remaining convictions*

McCullon was also convicted of first-degree murder, aggravated residential burglary, and first-degree terroristic threatening. Pursuant to Arkansas Code Annotated section 5-10-102(a)(2), a person commits first-degree murder if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2019). Further, a person commits aggravated residential burglary in violation of Arkansas Code Annotated section 5-39-204 if

> he or she commits residential burglary as defined in § 5-39-201 of a residential occupiable structure occupied by any person, and he or she:
>
> (1) Is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon; or
>
> (2) Inflicts or attempts to inflict death or serious physical injury upon another person.

11

Ark. Code Ann. § 5-39-204(a)(1)–(2) (Repl. 2013). A person commits residential burglary if "he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment." Ark. Code Ann. § 5-39-201(a)(1) (Repl. 2013). Serious physical injury is defined as a "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21) (Supp. 2019). Finally, pursuant to Arkansas Code Annotated section 5-13-301, a person commits first-degree terroristic threatening if "[w]ith the purpose of terrorizing another person, the person threatens to cause death or serious physical injury or substantial property damage to another person[.]" Ark. Code Ann. § 5-13-301(a)(1)(A) (Supp. 2019).

McCullon asserts that there was insufficient evidence to support each of the aforementioned convictions because the State's circumstantial evidence did not exclude every reasonable hypothesis other than his guilt. Specifically, McCullon contends that, despite the witness identifications at trial, none of the eyewitnesses observed the gunman shoot Criglar. The State responds first that McCullon's argument fails as to both the aggravated-residential-burglary conviction and the first-degree terroristic-threatening conviction, as neither offense required a showing that McCullon shot Criglar. Notwithstanding, the State asserts that substantial evidence supports McCullon's convictions and McCullon failed to identify any reasonable hypothesis consistent with his innocence to explain the substantial evidence presented at trial. We agree with the State.

We have held that guilt can be established without eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Dixon v. State*, 2011 Ark. 450, at 9, 385 S.W.3d

12

164, 171–72. Additionally, overwhelming evidence of guilt is not required in cases based on circumstantial evidence; the test is one of substantiality. *Id.* We are unpersuaded by McCullon's argument that a lack of direct eyewitness testimony regarding Criglar's shooting necessarily undermined his convictions. On the contrary, the State produced evidence at trial sufficient for the jury to conclude that McCullon purposely caused Criglar's death; unlawfully entered Criglar's home, armed with a deadly weapon, with the purpose of committing an offense punishable by imprisonment; and with the purpose of terrorizing Criglar's children, threatened them with death or serious physical injury. The State's evidence established that McCullon kicked in Criglar's front door and began arguing with her about stolen money, and this financial motive was reinforced by the testimony of several witnesses at trial. The testimony of MC1 and MC2 established that they heard multiple gunshots, and that a man, whom they later positively identified as McCullon on multiple occasions, then entered their bedroom, threatened them, and fired a shot into the floor. The children testified that they found their mother dead in the living room after the man left. McCullon's clothing tested positive for gunshot residue, a search of the apartment where he was arrested led to the discovery of a firearm box for a .40-caliber handgun and ammunition, and the shell casings found at the crime scene were also .40 caliber. Additionally, historical CSLI analysis performed by the FBI placed McCullon's cell phone in the general vicinity of the crime scene around the time law enforcement believed the shots were fired at Criglar's home according to surveillance footage from a nearby business. As discussed above, whether this evidence excluded every other hypothesis was left to the jury to decide.

13

Therefore, when considering this evidence in the light most favorable to the State, we conclude that there was substantial evidence to support McCullon's convictions for first-degree murder, aggravated residential burglary, and first-degree terroristic threatening.

B. Historical Cell Site Location Data

For his second point on appeal, McCullon contends that the circuit court erred when it admitted allegedly unreliable historical CSLI analysis. At the pretrial hearing during which the circuit court heard arguments on McCullon's motion in limine, Agent Downing testified that he had been a member of the FBI's CAST unit since 2018. Agent Downing described his extensive experience, education, and training, and stated that he had performed historical cell site analysis hundreds of times in his official capacity. Agent Downing explained that historical CSLI can only provide a general location of a cell phone based on its connection to nearby cell phone towers, but with the use of timing-advanced data, which existed in the present case, he was provided a distance measurement between the cell phone and the tower that allowed him to narrow down the possible location of the cell phone even further.

McCullon asserts that the State failed to carry its burden of proving that historical CSLI analysis is reliable based on the factors identified in *Daubert*, 509 U.S. 579. McCullon also argues that Agent Downing's testimony was substantially more prejudicial than probative. The State responds that *Daubert* does not apply to the present case because historical CSLI analysis is not "novel," but in any event, the circuit court's ruling was not an abuse of discretion. Additionally, the State argues that, because Agent Downing readily admitted that historical CSLI could not provide the precise location of a cell phone, it was not overly prejudicial. We agree with the State.

14

The decision of a circuit court to admit or exclude expert testimony is reviewed on an abuse of discretion standard. *Joyner v. State*, 2021 Ark. 78, at 22, 621 S.W.3d 124, 139. Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Arnold v. State*, 2022 Ark. 191, at 7, 653 S.W.3d 781, 787.

Rule 702 of the Arkansas Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ark. R. Evid. 702. In *Daubert*, the United States Supreme Court explained that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In *Farm Bureau Mutual Insurance Co. of Arkansas v. Foote*, we adopted the holding in *Daubert*. 341 Ark. 105, 14 S.W.3d 512 (2000). In accordance with *Daubert*, we concluded that, when faced with a proffer of expert scientific testimony, a circuit court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Foote*, 341 Ark. at 116, 14 S.W.3d at 519.

In *Daubert*, the Court explained that many factors could bear on this inquiry, including: (1) whether the scientific theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has general acceptance in the community. *Daubert*, 509 U.S. at 593–94. In *Kumho Tire Co. v. Carmichael*, the Court explained that "a [circuit] court may

consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a [circuit] court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141–42. Thus, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Carmichael*, 526 U.S. at 153.

Here, having reviewed the record, we conclude that the circuit court did not abuse its discretion when it admitted Agent Downing's testimony regarding historical CSLI analysis. The circuit court closely considered Agent Downing's testimony in accordance with the *Daubert* factors, concluding that the evidence was reliable because the underlying methodology had been tested by law enforcement, both civilian and military, and by the cell phone providers themselves. The circuit court further concluded that participation of professors at the Florida Institute of Technology, an entity that is presumably unaffiliated with the FBI, as well as cell phone engineers, in trainings provided to the CAST unit supported the reliability of the methodology. The circuit court had wide latitude in determining whether any of the *Daubert* factors were, or were not, reasonable measures of reliability in this particular case, and we cannot say that it exercised its discretion thoughtlessly. Accordingly, we affirm the circuit court on this point.

## C. Identifications

McCullon's third, fourth, and eighth points on appeal will be considered together as they are interrelated. For his third and fourth points on appeal, McCullon contends that the

circuit court erred when it admitted both MC1's and MC2'S allegedly unreliable pretrial identifications and permitted them both to identify McCullon in court. For his eighth point on appeal, McCullon asserts that the circuit court erred when it denied his motion to exclude an in-court identification of McCullon by Devon Wilson.

"We will not reverse a circuit court's ruling on the admissibility of an in-court identification unless that ruling is clearly erroneous under the totality of the circumstances. In making that determination, we look first at whether the pretrial identification procedure was unnecessarily suggestive or otherwise constitutionally suspect. It is an appellant's burden to show that a pretrial identification was suspect." *Wilson v. State*, 2022 Ark. 158, at 10, 651 S.W.3d 717, 723 (internal citations omitted). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Arnold v. State*, 2022 Ark. 191, at 4, 653 S.W.3d 781, 786.

We have held that "a pretrial identification violates the Due Process Clause when there are suggestive elements in the identification procedure that make it all but inevitable that the victim will identify one person as the culprit. However, even if prior identifications may have been improper or suggestive, an in-court identification will not be suppressed if indicia of reliability are found to independently exist. Thus, reliability is the linchpin in determining the admissibility of identification testimony." *Wilson*, 2022 Ark.158, at 10–11, 651 S.W.3d at 723–24 (internal citations omitted).

In determining reliability, we consider (1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty

17

demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure. *Thompson v. State*, 2019 Ark. 312, at 6, 586 S.W.3d 615, 621. We have explained that "[t]he conclusion to be drawn from these factors is dependent on the totality of the circumstances. It is for the trial court to determine if there are sufficient aspects of reliability present in an identification to permit its use as evidence. It is then for the jury to decide what weight that identification testimony should be given. We will not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of misidentification. Notably, the factors regarding the reliability of an in-court identification need not be addressed if it is determined that the pretrial identification procedure is not unduly suggestive." *Wilson*, 2022 Ark. 158, at 11, 651 S.W.3d at 724.

## 1.  *MC1*

Before trial, Detective Varner administered two six-person photo lineups to MC1, and the first lineup, while unrecorded, was presented to MC1 on November 20, 2019. At the hearing during which the circuit court heard arguments on McCullon's motions to suppress the identifications made by MC1, Detective Varner testified that, during the first lineup, "when [MC1] got to [McCullon's] picture her eyes got real big, you know, and she got nervous and then she just marked an 'X' over his face," and no one instructed her who to select. Detective Varner testified further that she brought MC1 back in for another lineup so that it could be recorded, and that this lineup had new photos, apart from McCullon's, but placed McCullon in a different position than he was shown in the first spread. MC1 identified McCullon in the second lineup. While the circuit court held that the first photo lineup was admissible because MC1 was certain as to her choice, it ruled that the second photo lineup was inadmissible because

18

"[it thought] the better practice would have been to keep, at least one or two of the original five in, in addition to the defendant and then add some more people or expand it to an eight person photo lineup instead. There should have been more variety than was there was."

McCullon contends that the pretrial identification procedures involving MC1 were unduly suggestive. McCullon argues that, because he was the only individual to appear in both photo arrays, it was inevitable that MC1 would identify him. McCullon further asserts that an analysis of the relevant reliability factors shows that MC1's pretrial identification was unreliable. Therefore, McCullon insists that the circuit court's decision to permit an in-court identification was clearly erroneous. The State responds that we have rejected an argument analogous to McCullon's regarding the inclusion of only his photo in both pretrial lineups, and that MC1's pretrial photo identification was not unreliable. We agree.

In *Monk v. State*, Monk argued that a physical lineup was suggestive, in part, because he was the only person from a photospread who also appeared in the physical lineup. 320 Ark. 189, 895 S.W.2d 904 (1995). However, we opined that "[i]t is doubtful that the physical lineup was rendered impermissibly suggestive by the fact that [Monk] was the only man from the photospread to reappear in the second identification procedure . . . [and] [c]learly, the appearance of different men in the second procedure was unavoidable. We observe from a picture of the physical lineup that the fillers all had similar physical characteristics to those of [Monk]." *Id*. at 196, 895 S.W.2d at 908.

Although *Monk* is not directly on point given that the issue before us involves two photo lineups rather than a photo lineup followed by an in-person lineup, we conclude that the same rationale applies to the present case because, as in *Monk*, there was a second identification procedure. In fact, in *King v. State*, a case involving multiple pretrial photo lineups, this court

19

stated that "in *Monk v. State*, *supra*, the fact the defendant was the only person included in both a photographic lineup and a physical lineup did not, in itself, render the identification unduly suggestive . . . The same rationale should apply here." 323 Ark. 558, 562, 916 S.W.2d 725, 728 (1996); *see also Matthews v. State*, 275 Ark. 1, 4, 627 S.W.2d 20, 22 (1982) (holding that the fact that the appellant was the only participant in both lineups does not make the last lineup conducted suggestive or prejudicial).

Here, the photo lineups at issue were not *per se* impermissibly suggestive merely because McCullon was the only one in the six-person photo array to appear in both lineups, because the "fillers" and McCullon all shared similar characteristics. Additionally, when a photographic identification is followed by an eyewitness identification at trial, as in the present case, this court will not set aside the conviction unless the photographic lineup was so suggestive as to create a substantial possibility of misidentification. *See, e.g.*, *Ray v. State*, 2009 Ark. 521, at 8, 357 S.W.3d 872, 878. From our review of the record, we cannot say that MC1's first pretrial photographic lineup was unduly suggestive. MC1 positively identified McCullon during the initial photo lineup, which was conducted within twenty-four hours of the home invasion, and there is no evidence that anyone attempted to improperly influence MC1 to draw an "X" on McCullon's photo. Additionally, MC1's second photo lineup was excluded by the circuit court, and therefore, it was not considered by the jury. Because MC1's first pretrial photo lineup was not unduly suggestive, we need not explore the issue of whether the identification was reliable under the totality of the circumstances. *See, e.g.*, *Wilson v. State*, 2022 Ark. 158, at 12, 651 S.W.3d 717, 724. Accordingly, we hold that the circuit court did not clearly err when it admitted MC1's pretrial identification and permitted her to make an in-court identification.

Before trial, Detective Hogard administered one six-person lineup to MC2 on November 20, 2019. At the hearing during which the circuit court heard arguments on McCullon's motions to suppress the identification made by MC2, Detective Hogard testified that "[MC2] said, no, on all of them, but when it got to a certain number, which was number five, he kind of hesitated and said it looks like him, but he said he was kind of lighter, lighter complexion than it was in this photo . . . I explained to him, keep in mind these are photos, things change in photos and just focus on his face . . . and we went ahead and went on to number six and when he saw number six he may have said, no, that wasn't him, and he went back to number five and he picked out number five." The person that MC2 identified was McCullon, and Detective Hogard testified that he seemed certain of his identification.

McCullon argues that MC2's pretrial identification was unreliable in consideration of the relevant reliability factors. The State responds that the court did not clearly err by admitting MC2's pretrial identification and allowing him to make an in-court identification. We agree with the State.

Here, as in MC1's case, MC2 made a photographic identification followed by an eyewitness identification at trial. Therefore, we will not set aside the conviction unless the photographic lineup was so suggestive as to create a substantial possibility of misidentification. Based on a review of the record, we cannot say that MC2's pretrial photographic lineup was unduly suggestive. MC2 positively identified McCullon during his only photo lineup, which was also conducted within twenty-four hours of the incident, and there is no evidence that anyone attempted to improperly influence MC1 to choose McCullon's photo as opposed to the other individuals depicted. Therefore, because MC2's pretrial photo lineup was not unduly

suggestive, we need not explore the issue of whether the identification was reliable under the totality of the circumstances. Accordingly, we hold that the circuit court did not clearly err when it admitted MC2's pretrial identification and permitted him to make an in-court identification.

### 3. *Devon Wilson*

McCullon asserts that, although Wilson did not make an in-court identification at trial, the circuit court nevertheless erred when it denied his motion to exclude Wilson's in-court identification. McCullon contends that the pretrial identification procedures were unconstitutionally suggestive for the same primary reasons he raises with respect to MC1's identifications. But with respect to Wilson, McCullon argues that the circuit court's decision to allow an in-court identification prejudiced him because it effectively neutralized his ability to bring up any errors made during the pretrial identifications that had been excluded from evidence, claiming that if he had done so, the State would have been emboldened to seek an in-court identification. The State responds that Wilson's pretrial identifications were reliable, but even still, any error in the circuit court's ruling was harmless because Wilson did not make an in-court identification. We agree with the State.

"Although some constitutional rights are so fundamental that their violation can never be deemed harmless error . . . others are subject to the harmless-error analysis. *See Chapman v. California*, 386 U.S. 18 (1967). To conclude that a constitutional error is harmless and does not mandate a reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict." *Jones v. State*, 336 Ark. 191, 207, 984 S.W.2d 432, 440 (1999).

Here, such an analysis requires us to excise the improperly admitted evidence—Wilson's in-court identification—and determine whether the remaining evidence shows, beyond a

22

reasonable doubt, that the error did not contribute to the verdict. Here, even if this court were to conclude that the pretrial identification procedures involving Wilson violated McCullon's due-process rights, thereby tainting any in-court identification, Wilson made no in-court identification at trial. Thus, there is no improper evidence to excise, and based on the evidence presented at trial, we cannot say that any error by the circuit court contributed to the verdict. Therefore, we conclude that any potential error made by the circuit court would be harmless, and we affirm.

## D. Racial Composition of Jury

For his fifth point on appeal, McCullon contends that the circuit court erred when it overruled his objection to the racial composition of the jury panel. Specifically, McCullon argues that we should overrule our precedent requiring criminal defendants to prove the systematic exclusion of distinctive groups in the community from the venire. The State responds that McCullon failed to establish a prima facie case in two respects, because he neither supported his claim with the proper statistics nor provided any evidence of the systematic exclusion of African Americans in Craighead County. We agree with the State.

The United States Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522 (1975); *see also Rodriguez v. State*, 372 Ark. 335, 341, 276 S.W.3d 208, 213 (2008). Although there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population . . . the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538. The criminal defendant carries

23

the burden of proving such systematic exclusion from the venire. *Rodriguez*, 372 Ark. at 341, 276 S.W.3d at 213–14; *see also Thomas v. State*, 370 Ark. 70, 77, 257 S.W.3d 92, 98 (2007). In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357 (1979); *see also Danzie v. State*, 326 Ark. 34, 43, 930 S.W.2d 310, 315 (1996).

Here, the Craighead County Circuit Clerk testified that the jury pool is drawn from the list of registered voters and the list of licensed drivers. As the State points out, we have held that "when the jury venire is drawn by random selection, the mere showing that it is not representative of the racial composition of the population will not make a prima facie showing of racial discrimination." *Thomas v. State*, 370 Ark. 70, 77–78, 257 S.W.3d 92, 99 (2007). Therefore, even if McCullon's research regarding the demographics of Craighead County was sufficient to satisfy the second prong of the *Duren* test, he concedes that he failed to provide evidence of systematic exclusion from the venire sufficient to satisfy the third prong. We decline McCullon's invitation to overturn longstanding precedent, as we do not lightly overrule our previous cases. *See Smith v. State*, 2013 Ark. 364, at 6. The policy behind stare decisis is to lend predictability and stability to the law. *Id*. There is a strong presumption of the validity of prior decisions, and it is necessary, as a matter of public policy, to uphold prior decisions unless great injury or injustice would result. *Id*. Precedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable. *Id*. Therefore, we conclude that

McCullon failed to establish a prima facie case of a violation of the fair-cross-section requirement and has likewise failed to cite any authority in support of a deviation from the standards articulated by this court and the United States Supreme Court. Accordingly, we affirm the circuit court on this point.

## E. Investigator's Note

For his sixth point on appeal, McCullon contends that the circuit court erred when it excluded evidence that the victim's neighbor saw three men in the victim's driveway on the night of the homicide. As an initial matter, the State contends that McCullon's argument is not preserved for our review because he failed to proffer the investigator's notes that he sought to have admitted. When evidence is excluded by the circuit court, the party challenging that decision must make a proffer of the excluded evidence at trial so that this court can review the decision, unless the substance of the evidence is apparent from the context. *Griffin v. State*, 2015 Ark. 340, at 11, 470 S.W.3d 676, 682.

In the present case, the substance of the statement within the investigator's notes is not apparent. In fact, McCullon admits that he does not know the name of the neighbor who allegedly provided the statement to the unnamed detective because "[i]t's not clear from the notes." Thus, apart from McCullon's claim regarding a potential suspect sighting in Criglar's driveway on the night of her murder, we cannot say for certain what the contents of the investigator's notes are. The burden of providing a record sufficient to demonstrate that reversible error occurred lies with the appellant. *Force v. State*, 2018 Ark. 157, at 2, 544 S.W.3d 540, 541. Therefore, we hold that, without the proffer, McCullon failed to preserve his argument regarding the investigator's notes he sought to admit, and we affirm the circuit court on this point.

25

F. Jury Instructions on Lesser-Included Offenses

For his seventh point on appeal, McCullon contends that the circuit court erred when it denied his requests for jury instructions on lesser-included offenses. Specifically, McCullon requested that the circuit court instruct the jury on second-degree murder, residential burglary, and second-degree terroristic threatening and asserts that there was a rational basis for each one because the slightest evidence supported their inclusion. As an initial matter, the State contends that this point is not preserved for our review because McCullon failed to proffer his requested jury instructions. We agree with the State.

We have held that "[i]t is the appellant's duty to present to this court a record sufficient to show that the circuit judge erred below. To preserve an objection to an instruction for appeal, the appellant must make a proffer of the proposed instruction to the judge. That proffered instruction must then be included in the record . . . to enable the appellate court to consider it. An instruction that is not contained in the record is not preserved and will not be addressed on appeal." *Robertson v. State*, 2009 Ark. 430, at 3, 347 S.W.3d 460, 462 (internal citations omitted). Here, because McCullon failed to proffer proposed instructions on the lesser-included offenses he sought at trial, this issue is not preserved for our review, and we affirm the circuit court on this point.

G. Motion to Dismiss Firearm Enhancement

For his final point on appeal, McCullon contends that the circuit court erred when it denied his motion to dismiss the firearm enhancement. His argument is twofold.

1. *Repeal by implication*

First, McCullon argues that the statute underlying the firearm enhancement, Arkansas Code Annotated section 16-90-120, was repealed when the legislature enacted the Arkansas

Criminal Code. Specifically, McCullon contends that the provisions in section 16-90-120, initially codified as Ark. Stat. Ann. § 43-2336 and enacted in 1969, were replaced by the adoption of Ark. Stat. Ann. § 41-1004 in 1975, which was later codified as Arkansas Code Annotated section 5-4-505. McCullon concedes that his position conflicts with our established precedent, but, relying on the dissenting opinion in *Williams v. State*, 364 Ark. 203, 210, 217 S.W.3d 817, 821 (2005) (Hannah, C.J., dissenting), McCullon nevertheless urges us to overrule this precedent. The State agrees that this court has considered and rejected McCullon's argument, and therefore, we should affirm the circuit court. We agree.

In *Sesley v. State*, we were faced with the same issue McCullon raises regarding Ark. Stat. Ann. § 43-2336 and § 41-1004, and held that

> [a]ll of the arguments presented by appellant on appeal have been addressed by this court in either [*Neely v. State*, 2010 Ark. 452, 370 S.W.3d 820] or *Williams*, and we have clearly rejected those arguments. Specifically, we have held that the statutes can be read in harmony, that § 41-1004 did not replace §§ 43-2336 . . . [and] that the General Assembly did not intend for the passage of the new criminal code to repeal the firearm-enhancement statute, and that allowing § 16-90-120 to remain viable does not result in the stacking of a general statute imposing a sentence for an offense in which a firearm may be used to commit the crime (such as aggravated robbery) onto the specific sentence enhancement for use of a firearm in the commission of a crime (the firearm-enhancement statute).

2011 Ark. 104, at 8, 380 S.W.3d 390, 394–95. Consistent with our discussion above regarding the doctrine of stare decisis, our conclusion mirrors our holding in *Sesley*. The law with regard to whether section 16-90-120 has been repealed by implication is well established, and McCullon has provided no argument to convince this court that it should reverse that precedent.

27

## 2. *Double jeopardy*

Second, McCullon asserts that applying the firearm enhancement in the present case violated state and federal prohibitions on double jeopardy because the offenses he was convicted of involve the use of a firearm. Relying again on the dissenting opinion in *Williams*, McCullon argues that the legislature has not clearly authorized multiple punishments in the present case. Once more, McCullon concedes that his argument has been addressed by established precedent, but he invites us to reconsider our position. The State agrees that McCullon's argument has been considered and rejected, and we should affirm. We agree with the State.

The Double Jeopardy Clause protects criminal defendants from multiple punishments for the same offense. *See N.D. v. State*, 2012 Ark. 265, at 9, 411 S.W.3d 205, 210. However, "[b]oth the United States Supreme Court and this court have made it clear that it is the legislature that determines crimes, fixes punishments, and has the authority to impose cumulative punishments for the same conduct. *See Missouri v. Hunter*, 459 U.S. 359 (1983)." *Rowbottom v. State*, 341 Ark. 33, 38–39, 13 S.W.3d 904, 907 (2000). Thus, "the question under the Double Jeopardy Clause whether punishments are multiple is essentially one of legislative intent[.]" *Ohio v. Johnson*, 467 U.S. 493 (1984); *see also Pelletier v. Kelley*, 2018 Ark. 347, at 4, 561 S.W.3d 730, 733. When "a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes[.]"[3] *Hunter*, 459 U.S. at 368–69.

---

[3]Whether two offenses are the "same offense" under *Blockburger* depends on whether each statutory provision requires proof of a fact that the other does not. *Sims v. State*, 2018 Ark.

Accordingly, the preliminary issue facing this court is whether the legislature has authorized application of the firearm enhancement set forth in Arkansas Code Annotated section 16-90-120 to felonies that involve the use of a firearm. We construe criminal statutes strictly, resolving any doubts in favor of the defendant. *Hinton v. State*, 2015 Ark. 479, at 7, 477 S.W.3d 517, 522. We also adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Id*. We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language, and if the language of the statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation. *Id*.

Arkansas Code Annotated section 16-90-120 states that "[a]ny person convicted of any offense that is classified by the laws of this state as a felony who employed any firearm of any character as a means of committing or escaping from the felony, in the discretion of the sentencing court, may be subjected to an additional period of confinement in the state penitentiary for a period not to exceed fifteen (15) years . . . [and] [t]he period of confinement, if any, imposed under this section shall be in addition to any fine or penalty provided by law as punishment for the felony itself." Ark. Code Ann. § 16-90-120(a)–(b).

In *Hinton v. State*, Hinton argued that the firearm-enhancement statute did not apply to felonies that require possession of a firearm as an element of the offense. 2015 Ark. 479, at 7, 477 S.W.3d 517, 522. In construing the language of Arkansas Code Annotated section 16-90-

271, 555 S.W.3d 868. "A single act may be an offense against two statutes, and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Sherman v. State*, 326 Ark. 153, 162–63, 931 S.W.2d 417, 423 (1996) (quoting *Blockburger v. United States*, 284 U.S. 299 (1932)).

120, we held that "[t]he plain language of the firearm-enhancement statute shows that *the legislature intended* for it to apply to 'any offense . . . in addition to any fine or penalty provided by law as punishment for the felony itself.'" *Id*. at 8, 477 S.W.3d at 523 (emphasis added). Further, we noted that our prior cases "did not make a distinction that a felony that could not be committed without a firearm cannot be subject to the firearm enhancement." *Id*. at 9, 477 S.W.3d at 523.

Here, McCullon bases his contention that the legislature has not clearly authorized multiple punishments in the present case on the dissenting opinion in *Williams*, which stated, "An analysis of statutory history shows that the law on enhancement for use of a firearm is confused at best." *Williams*, 364 Ark. at 212, 217 S.W.3d at 823. However, his argument is unavailing because, as discussed above, we have expressly held that legislative intent supports the application of the firearm-enhancement sentence to *any* offense that is classified as a felony *in addition* to *any* fine or penalty provided by law as punishment for the felony itself. Consistent with that holding, we conclude that the legislature clearly authorized the imposition of the firearm-enhancement sentence in addition to the sentences McCullon received for his convictions that involved the use of a firearm, and a *Blockburger* analysis is therefore unnecessary. Therefore, the circuit court did not err when it denied McCullon's motion to dismiss the firearm enhancement and we affirm on this point.

Affirmed.

*Tinsley & Youngdahl, PLLC*, by: *Jordan B. Tinsley*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen.; and *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.