Cite as 2024 Ark. App. 482

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CR-23-166

| | |
|---|---|
| MARCUS A. BALLARD<br>APPELLANT | Opinion Delivered October 9, 2024 |
| | APPEAL FROM THE FAULKNER<br>COUNTY CIRCUIT COURT<br>[NO. 23CR-21-593] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE H. G. FOSTER, JUDGE |
| | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Marcus Ballard appeals from his conviction on charges of (1) first-degree domestic battering committed in the presence of a child, in violation of Arkansas Code Annotated section 5-26-305(b)(2) (Supp. 2021); (2) aggravated assault on a family or household member committed in the presence of a child, in violation of Arkansas Code Annotated section 5-26-306 (Supp. 2023); (3) three counts of first-degree terroristic threatening, in violation of Arkansas Code Annotated section 5-13-301 (Supp. 2023); and (4) second-degree endangering the welfare of a minor, in violation of Arkansas Code Annotated section 5-27-206 (Repl. 2013).[1] Those convictions resulted in a prison sentence as a habitual offender of eighty years.

---

[1]Ballard initially also was charged with possession of a firearm by certain persons, but that count was severed before trial and dismissed by the State after Ballard's conviction and sentence of eighty years in prison. The order of nolle prosequi was entered on October 21, 2022, and the dismissal eliminated any doubt about finality for purposes of appeal.

Ballard argues that he is entitled to a new trial because the circuit court erroneously excluded impeachment evidence. We affirm.

I. *Facts and Procedural History*

In the early-morning hours of June 6, 2021, police learned that Brandi Wallace was in need of assistance at a residence located at 16 Starlight Road in Mayflower where she lived with her minor child, MC, and then boyfriend, Ballard. Police found Ms. Wallace running down the road. She had visible injuries and played for officers the audio recordings on her phone that captured Ballard threatening to "break your f***ing neck bitch . . . I'll shoot you in the f***ing head."

At a pretrial hearing, Ballard sought permission to introduce copies of alleged text messages that Ms. Wallace had sent to his sister purporting to state that she wanted the charges against Ballard dropped. The State objected that these text messages were irrelevant to Ballard's underlying crimes, and Ballard argued that "the relevance of those messages would point to the credibility of the alleged victim and . . . her frame of mind." The circuit court agreed with the State but expressly stated it would reconsider the admissibility of the text messages were they to become relevant and did not preclude Ballard from inquiring about any prior statements made by Ms. Wallace during the upcoming trial, which was held on October 19, 2022.

At trial, Officer Andrew Stubbe testified that he was on duty and pulled into Ms. Wallace's neighborhood after a domestic-violence incident involving a firearm was reported on June 6, 2021. Officer Stubbe noted that while he was driving toward Ms. Wallace's

residence, she "came up running behind [his] patrol unit holding her child screaming in fear." Officer Stubbe stated he saw "abrasions" on Ms. Wallace's body, and he stated that Ballard pulled up in another vehicle when he was speaking to Ms. Wallace. Officer Stubbe directed her to get behind his patrol unit, drew his service weapon, and instructed Ballard to exit the vehicle before approaching him.

After certified copies of Ballard's prior domestic-battering convictions were introduced as exhibits by the State, Ms. Wallace took the stand. She stated that she and Ballard were in a "dating relationship" and were living together with her then two-year-old daughter, MC, at her residence on June 6, 2021. She testified that Ballard had been drinking "heavily" that day, which led to a physical altercation between them after the two got into an argument. When asked about this physical altercation, Ms. Wallace explained that Ballard first "grabbed [her] throat at one point because [she] was not trying to look at him." She explained that she "couldn't breathe," and she stated that Ballard pushed her away from the door when she attempted to leave the residence. Ms. Wallace went into the kitchen to grab her car keys, but Ballard "grabbed" her arm and, using his fist, then "clocked [her] in the jaw."

Ms. Wallace testified that she went into the bedroom where MC was sleeping and used a social media app on her phone to message a family friend—an off-duty officer—to send help. Soon after, Ballard entered the bedroom and "said he was gonna . . . make [MC] watch him kill her mamma then he was gonna take her with him and go kill my parents[.]" Ms. Wallace stated that she immediately picked up MC and ran toward the front door, but

3

Ballard repeatedly tried to "grab" MC from her arms, which caused MC's head to hit the wall before Ms. Wallace ran outside with her. Despite acknowledging the bruises, Ms. Wallace admitted that she remained in contact with him shortly following his arrest.

Ms. Wallace made audio recordings on her cell phone of the events that transpired on June 6, 2021. These three separate recordings were collectively introduced as State's exhibit 16 and played at trial. The jury heard Ballard threaten her when he stated, "I'm about to f***ing punch you in your god d*** mouth" on the first recording. The second recording captured Ms. Wallace crying out "ow" immediately after Ballard commanded her to "[g]ive me the mother f***ing keys." Ms. Wallace elaborated that the "ow" was in response to Ballard grabbing her arm immediately before he punched her face. The last recording also captured Ballard's twice threatening to "break [Ms. Wallace's] neck," and warning her that "you're gonna get shot in the f***ing head."

On cross-examination, defense counsel inquired about Ms. Wallace's contact with Ballard following his arrest but did not inquire about any text messages she had sent thereafter or whether she had expressed any desire regarding the disposition of his case. Neither did Ballard move to admit or proffer any extrinsic evidence for purposes of impeaching Ms. Wallace's credibility before she was excused as a witness.

Ballard moved for directed verdicts at the conclusion of the State's case-in-chief. The circuit court denied these motions as well as Ballard's renewed directed-verdict motions at the close of all the evidence.

The jury convicted Ballard on all counts, and a sentencing order was entered on October 21, pursuant to which Ballard was sentenced as a habitual offender to eighty years in prison. Ballard filed a timely notice of appeal on November 14.

## II. *Discussion*

Ballard maintains that the State's case depended entirely on the jury's believing Ms. Wallace's account of the alleged incident. Jurors would have had to believe that she was telling the truth when she said Ballard pushed and choked her, threatened to shoot her in front of MC, and threatened to kill her family and disappear with MC. Even acknowledging the audio recordings, he urges that the majority of the case, if not the entire case, turned on Ms. Wallace's credibility.

In turn, Ballard argues that his defense rested entirely on impeaching Ms. Wallace's credibility. He had to raise reasonable doubt in the jurors' minds that she was not telling the truth, employing all the tools of impeachment available to his skilled advocate. Ballard, citing *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970), and *Resurrection Gold Mining Co. v. Fortune Gold Mining Co.*, 129 F. 668 (8th Cir. 1904), submits that the most important of those tools is the ability to engage in open, wide, robust cross-examination, which has been held to be fundamental.

Ballard urges that the circuit court severely curbed his ability to impeach Ms. Wallace and tied his lawyer's hands when it kept him from bringing to light before the jury that Ms. Wallace subsequently expressed that she thought the charges against Ballard should be dropped. He maintains that had the jury been informed of Ms. Wallace's comments, her

entire story would have become less—if not wholly—unbelievable. While acknowledging that the circuit court "has wide discretion on rulings concerning the admissibility of evidence, and this court will not reverse such a ruling absent an abuse of discretion," *Lee v. State*, 340 Ark. 504, 512, 11 S.W.3d 553, 558 (2000), Ballard maintains that its discretion was abused when his ability to impeach Ms. Wallace was taken away. As such, Ballard claims he is entitled to a new trial.

We disagree. Ballard's suggestion that the circuit court's pretrial ruling somehow limited his ability to cross-examine Ms. Wallace is not supported by the record. The ruling pertained solely to extrinsic evidence—the alleged text messages between Ms. Wallace and his sister—and Ballard was never precluded from cross-examining Ms. Wallace at trial about any prior inconsistent statements. Even were we to conclude otherwise, Ballard's failure to secure a ruling at trial regarding the alleged prior inconsistent statements made by Ms. Wallace waived his claim and precludes its consideration on appeal. *E.g.*, *Alexander v. State*, 2021 Ark. App. 113, at 5, 618 S.W.3d 472, 474.

Similarly, "[w]hen evidence is excluded by the circuit court, the party challenging that decision *must* make a proffer of the excluded evidence at trial so that this court can review the decision, unless the substance of the evidence is apparent from the context." *McCullon v. State*, 2023 Ark. 190, at 25, 679 S.W.3d 358, 377 (emphasis added). Ballard suggests that the text messages sent by Ms. Wallace amounted to prior statements inconsistent with her testimony, but he did not proffer this extrinsic evidence either at the pretrial hearing or at

his trial. Ballard failed to even inquire about the alleged text messages when he cross-examined Ms. Wallace.

Accordingly, because Ballard failed to proffer the text messages and it is not apparent that the alleged text messages contained statements inconsistent with Ms. Wallace's testimony, this court declines to consider whether this extrinsic evidence was admissible to impeach Ms. Wallace's credibility. Ballard's claim that the circuit court "infringed" on his rights under the Confrontation Clause to impeach Ms. Wallace's credibility with her prior statements, including her alleged text messages, is not preserved because this argument was never raised or ruled on by the circuit court below. *E.g.*, *DeVault v. State*, 2021 Ark. App. 269, at 10–11.

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Murray Law Office, PLLC*, by: *Chris T. Murray*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Michael Zangari*, Ass't Att'y Gen., for appellee.